## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| **WILLIAM GRIBBLE,** | : | **CIVIL ACTION** |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| **LOUIS S. FOLINO, et al.,** | : | **NO. 09-2091** |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

**LYNNE A. SITARSKI**                                                                 **NOVEMBER 19, 2010**
**UNITED STATES MAGISTRATE JUDGE**

Presently before the court is a *pro se* petition for writ of habeas corpus filed pursuant to

28 U.S.C. § 2254 by William Gribble ("Gribble"), an individual currently incarcerated in the

State Correctional Institute - Greene at Waynesburg, Pennsylvania.  For the reasons that follow, I

respectfully recommend that the petition be **DENIED**.


I.      **FACTS AND PROCEDURAL HISTORY**

The following facts were set forth by the Pennsylvania Supreme Court:

[I]n early November of 1992, Gribble, an admitted drug addict, and his girlfriend
[Kelley] O'Donnell, were staying in an apartment at 3123 Richmond Street in
Philadelphia.  The apartment belonged to Agnes McClinchey (McClinchey), who had
given Gribble and O'Donnell permission to stay in the apartment while she traveled
to western Pennsylvania. James Matthews (Matthews), an elderly friend of
McClinchey who drank heavily, also resided in the apartment.

At approximately 10:00 p.m. on Wednesday, November 11, 1992, O'Donnell arrived
at a pizza shop that [Eleftherios] Eleftheriou managed.  O'Donnell offered to pawn
a leather jacket to Eleftheriou in exchange for ten dollars.  An employee of the pizza
shop observed Eleftheriou remove a "whole lot of money" in a roll from his pocket
to pay O'Donnell for the jacket.  O'Donnell and Eleftheriou then made arrangements

to meet later that evening. After closing the pizza shop at 1:00 a.m. on November 12, 1992, Eleftheriou left in his car to meet O'Donnell. He met O'Donnell on a street corner and accompanied her to the apartment at 3123 Richmond Street.

In a sworn confession later given to police, Gribble stated that he arrived at the apartment at approximately 2:00 a.m. and saw Eleftheriou and O'Donnell on the couch together. Matthews was asleep in the back room. According to Gribble, Eleftheriou "was feeling all over" O'Donnell. Gribble then "freaked." He hit Eleftheriou once with his fist, grabbed a hammer that was resting on a television, and beat Eleftheriou approximately ten or fifteen times with the hammer until Gribble "knew [Eleftheriou] was dead." Gribble claimed that O'Donnell left the apartment at some point during the attack on Eleftheriou. Next, Gribble dragged Eleftheriou's body behind the house, covered him with a piece of plywood, and returned to the house to decide what to do. A short time later, Gribble uncovered Eleftheriou's body, dropped him through an access hole into the basement, and began to dismember the body. While Gribble was carving apart the body, O'Donnell returned to the apartment and said she was sick. O'Donnell telephoned police, who dispatched a rescue squad to the apartment. After the rescue squad arrived and transported O'Donnell to the hospital, Gribble said he returned to the basement and finished dismembering Eleftheriou. Gribble also admitted that he cut off Eleftheriou's penis "for spite." He then bagged the body parts and cleaned the basement. O'Donnell came back from the hospital a few hours later and she and Gribble went to sleep.

According to Gribble's confession, they awoke early on the morning of Thursday, November 12, 1992, and he loaded the body into Eleftheriou's car. He drove to Delaware Avenue in Philadelphia and threw half the bags from the car into a dump site. Gribble said he then took the remainder of the bags back to the apartment and he and O'Donnell went to sleep. Gribble also admitted that he took money and a credit card from Eleftheriou's wallet, and later that evening, he and O'Donnell drove to a children's clothing store in Philadelphia where O'Donnell used Eleftheriou's credit card to purchase clothing for Gribble's children. [FN14]

FN 14. After her arrest, O'Donnell also confessed to the murder of Eleftheriou, and her statement was admitted at trial. O'Donnell's version of the murder, however, differs significantly from Gribble's statement. O'Donnell claims that she was motivated to kill Eleftheriou because he had sexually assaulted her in the pizza shop on a prior occasion. O'Donnell said that she brought Eleftheriou back to the apartment, and while he was looking out a window, she struck him in the head with a hammer. After Eleftheriou fell to the floor, O'Donnell alleges that she continued to beat him with the hammer and then took his body into the yard and left it unattended. Later, O'Donnell claims to have taken the body to the basement, "sawed him up

with a hacksaw," and put the body parts in trash bags. She also admitted that she cut off Eleftheriou's penis and placed it in a pencil case with the intention of sending the penis to her father to annoy him. She further contends that Gribble did not take part in beating and dismembering Eleftheriou, but she admits that he did assist her in disposing of the body parts along Delaware Avenue.

On the morning of Friday, November 13, 1992, Philadelphia police received a report that someone had found body parts in a trash dump in the 3900 block of North Delaware Avenue. When they arrived on the scene, they found a blood stained quilt and a left arm next to a trash bag. Inside another nearby trash bag, they found a torso with the head missing. In a smaller bag there was a blood-covered head, with the left eye missing. A short distance away, police found a right arm inside another bag. These body parts were later identified as belonging to Eleftheriou. Among papers strewn around the site, police found a letter addressed to Agnes McClinchey, 3123 Richmond Street, Philadelphia.

Later on November 13, 1992, McClinchey returned to 3123 Richmond Street from western Pennsylvania. She found blood on the front door and a stain on the carpet. She also noticed that the walls were cleaner than when she left. O'Donnell told McClinchey that she and Gribble were involved in a murder and that the victim's head had been found on Delaware Avenue. McClinchey also heard O'Donnell tell Gribble to burn the car. When Gribble returned from this task, O'Donnell said to him "[t]hank God, you didn't get caught." That same evening, police received a report of a car fire on D Street. When police and fire fighters arrived on the scene, they found a car in flames. After extinguishing the fire, police examined the interior of the car and found two human legs and the lower portion of a male torso, with its penis missing. The body parts were later identified as belonging to Eleftheriou.

McClinchey subsequently called the police, who interviewed her at a gas station near her apartment. The police then went to her apartment and arrested Gribble and O'Donnell. A search of the basement revealed, among other things, a serrated kitchen knife, a chisel, and a claw hammer, each containing traces of human tissue and blood. Stuffed inside a pipe, police found a pencil case containing a human eye and a penis. Police took Gribble and O'Donnell into custody for questioning. After waiving their rights, Gribble and O'Donnell gave their separate statements confessing to the murder of Eleftheriou.

At trial, an assistant medical examiner testified that there were numerous abrasions on Eleftheriou's head that were consistent with blows from a hammer. The injuries to Eleftheriou's head indicated that he was not moving when most of the blows were inflicted. The assistant medical examiner also testified that red abrasions at the site where the head and right arm were sawed off indicate that the heart was still beating

when those body parts were severed. He further testified that it would have taken two people working together to dismember Eleftheriou's body in the estimated fifteen minuets before he bled to death.

*Commonwealth v. Gribble* (*Gribble I*), 703 A.2d 426, 429-431 (Pa. 1997).

On June 30, 1993, after a joint bench trial before the Honorable Paul Ribner of the Court of Common Pleas of Philadelphia County, Gribble and his codefendant, O'Donnell, were convicted of first degree murder for the death of Eleftherios Eleftheriou. Gribble was also convicted of criminal conspiracy, possessing instruments of crime, robbery, theft by unlawful taking, unauthorized use of an automobile, arson, risking catastrophe, forgery, abuse of a corpse and credit card fraud. After a non-jury penalty hearing held the same day, Gribble was sentenced to death. On August 11, 1994, Judge Ribner denied all post-trial motions and formally imposed sentence. Gribble received the death penalty for first degree murder, three to six years for robbery, two to four years for conspiracy, six to twelve months each for possessing an instrument of crime and forgery, and four to eight months for arson, with all sentences to run concurrent to the death sentence. Judge Ribner imposed no further penalty with respect to Gribble's remaining convictions.

On August 12, 1994, Gribble filed a direct appeal to the Pennsylvania Supreme Court. On direct appeal, Gribble presented the following claims:

(1)     The trial court erred in finding Appellant guilty of first degree murder as there was not sufficient evidence of premeditation or specific intent to kill.

(2)     The trial court erred in finding Appellant guilty of first degree murder as the intent to kill or seriously injure was the product of Appellant's legally provoked rage which overrode his ability for cool reflection and clouded his reason.

(3)     The trial court erred in finding Appellant guilty of first degree murder as he was under the influence of alcohol and drugs at the time of the killing which affected

his ability to form the specific intent to kill.

(4)     The trial court erred in finding appellant guilty of robbery as the evidence presented was insufficient.

(5)     The trial court erred in finding as an aggravating factor that Appellant killed deceased during the perpetration of a felony in that Appellant did not intend to rob the deceased before or during the beating which led to the death.

(6)     The death sentence was error and must be vacated as it was a product of passion and prejudice by the court.

(7)     The death sentence was error and must be vacated as the one aggravating circumstance found does not outweigh the five mitigating circumstances presented and two found.

(8)     The death sentence was error and must be vacated as the proportionality review mandated by statute is internally flawed and defective, denying Appellant due process of law.

(9)     The trial court erred in admitting, over defense objection, an undisclosed, deleted, inculpatory portion of Appellant's written statement and an undiscovered incriminating oral statement, which statements were not provided to the defense in willful violation of Rule of Criminal Procedure 305(B)(1)(b), and which surprise statements were so highly prejudicial as to deny Appellant a fair trial.

(10)    Appellant was denied his rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and Article 1 Sections 8 and 9 of the Pennsylvania Constitution as all evidence and statements seized were the product of an illegal arrest and should have been suppressed.

(11)    Appellant was denied his right of confrontation pursuant to the Sixth Amendment to the United States Constitution and Article 1 section 9 of the Pennsylvania Constitution when codefendant's statement was used at his trial without his being able to cross-examine her.

The Pennsylvania Supreme Court affirmed Gribble's convictions and death sentence on November 20, 1997. *Gribble I*, 703 A.2d at 441. On November 16, 1998, the United States Supreme Court denied Gribble's petition for writ of *certiorari*. *Gribble v. Pennsylvania*, 525 U.S. 1005 (1998).

Subsequently, Gribble filed a *pro se* petition for relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. ANN. § 9541 *et seq*., raising the following claims:

(1)     Trial counsel was ineffective for failing to file a motion to suppress illegally seized evidence on the grounds that:

    a.     There was insufficient probable cause at the time of the arrest.
    b.     The forcible entry violated the knock and announce rule.
    c.     No exigent circumstances existed to justify the warrantless arrest and subsequent search.
    d.     No search warrant was obtained after the premises was secure.

(2)     Trial Counsel was ineffective for failing to object to hearsay statements made by Agnes McClinchey.

(3)     Trial counsel was ineffective for failing to file a motion to suppress inflammatory photographs.

(4)     Trial counsel was ineffective for failing to object to the admission of victim impact evidence during the penalty phase hearing.

(5)     Trial counsel was ineffective for failing to challenge the procedures in which the evidence was collected by the police before the crime unit arrived.

(6)     Trial counsel was ineffective for withdrawing:

    a.     The motion for severance.
    b.     The motion to suppress statement.

(7)     Trial counsel was ineffective for failing to inform the Petitioner of the importance of character witnesses.

(8)     Trial counsel was ineffective for failing to present any viable defense.

(9)     The trial court erred in expressly relying on an unredacted, pre-trial confession of a non-testifying codefendant as evidence in determining the Petitioner's guilt.

(10)    The prosecutor committed reversible error during the penalty phase of the trial by introducing inadmissable evidence in the form of a victim impact evidence.

(11)    The information compiled by the Administrative Office of the Pennsylvania Courts is not kept updated by the President Judge of each county as ordered by the Supreme Court of Pennsylvania.

(12)    The proportionality review that was conducted by the Supreme Court of Pennsylvania is internally flawed and based on erroneous and unreliable data, the Petitioner's death sentence should be vacated and a life sentence imposed.

The Court appointed PCRA counsel for Gribble, and counsel filed two Amended PCRA petitions. In these Amended PCRA petitions, Gribble presented additional claims with respect to the penalty and guilt phases of his trial. With respect to the penalty phase, Gribble asserts that his trial counsel was ineffective for failing to object to a defective and inadequate jury waiver colloquy and for failing to present available mitigation evidence. With respect to the guilt phase, Gribble asserts that his trial counsel was ineffective for failing to object to certain hearsay statements that were admitted during trial, for withdrawing a meritorious petition to sever Gribble's trial from his codefendant, and for failing to introduce character evidence in his defense. The Honorable James A. Lineberger of the Court of Common Pleas of Philadelphia County heard argument on the PCRA issues, but did not grant an evidentiary hearing. On March 21, 2001, Judge Lineberger granted Gribble a new penalty hearing and denied all other relief.

Gribble filed a notice of appeal from the portion of the PCRA order denying relief; Respondent filed a cross-appeal from the portion of the PCRA order granting Gribble a new penalty hearing. On December 21, 2004, the Pennsylvania Supreme Court concluded that Gribble's PCRA guilt phase claims were without merit, but remanded the case for an evidentiary hearing on whether counsel was ineffective for failing to object to the penalty phase jury waiver colloquy, and whether counsel was ineffective for allegedly failing to conduct an adequate investigation for purposes of presenting available mitigation evidence during the sentencing

hearing.  *Commonwealth v. Gribble* (*Gribble II*), 863 A.2d 455, 460-467,  476-477 (Pa. 2004).

On remand, the Honorable Peter F. Rogers of the Court of Common Pleas of Philadelphia

County held an evidentiary hearing on August 9, 2006.  On March 8, 2007, Judge Rogers granted

Gribble a new sentencing hearing.

Gribble's sentencing hearing was held before the Honorable Shelley Robins New of the

Court of Common Pleas of Philadelphia County.  At the conclusion of the hearing on March 10,

2009, the jury was unable to reach a unanimous decision for the death penalty.  As a result,

Gribble was sentenced to life imprisonment for his first degree murder conviction.  Judge Robins

New also imposed a sentence of ten to twenty years for causing a catastrophe, two and a half to

five years for possessing an instrument of crime, and one to two years for forgery.  These

sentences were ordered to run concurrent to Gribble's life sentence and concurrent to each other.

In addition, Judge Robins New sentenced Gribble to five to ten years for conspiracy to commit

first degree murder to run consecutive to the sentence for causing catastrophe, ten to twenty years

for robbery to run consecutive to the sentence for causing catastrophe, five to twenty years for

arson to run consecutive to the sentence for robbery and one to two years for abuse of a corpse to

run consecutive to the sentence for arson.  On April 9, 2009, Gribble filed a notice of appeal with

the Pennsylvania Superior Court challenging the imposition of sentences for his convictions

other than for first degree murder.[1]

---

[1] The Superior Court of Pennsylvania affirmed the trial court on July 26, 2010.  On
August 16, 2010, Gribble filed a Petition for Permission to Appeal to the Pennsylvania Supreme
Court.  Pa. Super. Docket 1042 EDA 2009.

On May 7, 2009,[2] Gribble filed the instant *pro se* petition for habeas corpus asserting the following grounds for relief:

(1)    The trial judge committed reversible error in expressly relying on a codefendant's confession as evidence in determining Petitioner's guilt.

(2)    The prosecutor and suppression hearing judge committed reversible error by interjecting themselves into the investigation process.

(3)    Petitioner was denied effective assistance of counsel because his trial counsel was ineffective for:

        (a)    failing to interview or call Rose Stoddart as a witness during trial.
        (b)    failing to interview or call Gail Stacy as a witness during trial.
        (c)    failing to interview or call Joe Boles as a witness during trial.
        (d)    failing to retain an expert to refute the questionable conclusions of the medical examiner.
        (e)    failing to conduct his own independent investigation into obtaining codefendant O'Donnell's hospital records from the night in question.
        (f)    failing to investigate and introduce the telephone and radio tape transmittals from the night in question.
        (g)    failing to interview codefendant O'Donnell to elicit information as to why her statement was false, and the reason she lied about committing the crime.
        (h)    failing to investigate and use available character evidence during trial.
        (i)    failing to litigate two meritorious pre-trial motions.
        (j)    failing to investigate into Petitioner's heavy drug and alcohol abuse from a very early age.
        (k)    failing to present any viable defense.

(4)    Actual innocence.

Gribble filed an Amended Habeas Petition on July 8, 2009, in which he asserts the following additional ground for relief:

(5)    The Petitioner's constitutional rights were violated by trial counsel's failure to

---

[2] Generally, a *pro se* prisoner's habeas petition is deemed filed at the moment he delivers it to prison authorities for mailing to the district court. *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998) (citing *Houston v. Lack*, 487 U.S. 266 (1988)). Gribble signed his habeas petition on May 7, 2009, and I will assume that he presented his petition to prison authorities on that date.

object to the admission and the use of an unredacted, unreliable pre-trial confession of a non-testifying codefendant.

On November 12, 2009, after being informed that Gribble has an open appeal in state court, I directed Gribble to confirm his desire to proceed with the instant petition as filed or, alternatively, to withdraw it and submit another habeas petition after the state courts have ruled on the claims in his pending appeal. On November 23, 2009, Gribble confirmed his desire to proceed with the instant petition as filed. Thereafter, on February 12, 2010, Respondent filed its answer asserting that Gribble is not entitled to relief because his claims are noncognizable, procedurally defaulted, and/or reasonably adjudicated as without merit by the state courts. On March 22, 2010, Gribble filed a reply to Respondent's answer. Respondent filed a response to Gribble's reply on May 20, 2010 and, in turn, Gribble filed a reply and supplemental reply on June 24, 2010 and July 8, 2010, respectively.

Subsequently, Respondent moved to file a response to Gribble's reply and supplemental reply. I granted Respondent's motion and set September 15, 2010 as their deadline to file and gave Gribble until October 6, 2010 to reply. Respondent failed to meet their deadline. On October 4, 2010, Gribble filed a response assuming that he had not been served with Respondent's response. On October 5, 2010, Respondent filed a Motion for Leave to File their Response to Petitioner's Replies (from June and July 2010) Out of Time. On October 15, 2010, the court received a letter from Gribble dated October 9, 2010 in which he acknowledged his receipt of Respondent's motion and asked the court to accept the letter as his reply to Respondent. I granted Respondent's motion for leave and gave Gribble until October 29, 2010 to supplement his letter reply. No further filings were made, thus Gribble's October 9, 2010 letter

was docketed as his reply to Respondent's October 5, 2010 filing.

## II.    <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") grants to persons in state or federal custody the right to file a petition in a federal court seeking the issuance of a writ of habeas corpus.  See 28 U.S.C. § 2254.  AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts.  *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002); *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000) (citing *Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996)).  Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a petition for habeas corpus may only be granted if: (1) the state court's adjudication of the clam resulted in a decision contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of United States;" or if (2) the adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  *Werts*, 228 F3d at 196.

The Supreme Court expounded upon this language in *Williams v. Taylor*, 529 U.S. 362 (2000).  In *Williams*, the Court explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Hameen v. State of*

*Delaware*, 212 F.3d 226, 235 (3d Cir. 2000) (citing *Williams*, 529 U.S. at 389-390). The Court in *Williams* further stated that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the sate court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Hameen*, 212 F.3d at 235 (citing *Williams*, 529 U.S. at 388-389). "In further delineating the 'unreasonable application of' component, the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." *Werts*, 228 F.3d at 196 (citing *Williams*, 529 U.S. at 389).

## III.    DISCUSSION

Gribble raises five claims for relief. In Claim 1, he alleges that the trial judge committed reversible error in expressly relying on his codefendant's confession as evidence in determining his guilt. In Claim 2, he contends that the prosecutor and suppression hearing Judge committed reversible error by interjecting themselves into the investigation process. In Claim 3, he identifies eleven instances of alleged ineffectiveness of trial counsel (subsections (a)-(k)). Claim 4 is a claim of actual innocence. And, in Claim 5, Gribble contends that his constitutional rights were violated by trial counsel's failure to object to the admission and the use of an unredacted, unreliable pre-trial confession of a non-testifying codefendant.

After a thorough review of Gribble's habeas petition, Respondent's answer and the parties' other submissions, I respectfully recommend that claim 2, claim 3 subsections (a)-(h), (j) and (k), and claim 5 be dismissed as procedurally defaulted. Additionally, I recommend that claim1 be rejected as without merit, and that claim 3 subsection (i) be dismissed as procedurally defaulted in part and denied as without merit in part. Claim 4, in which Gribble asserts a miscarriage of justice to overcome his procedural default, is also without merit, as discussed below.

### A. Claim No. 3 Subsections (a)-(h), (j) and (k): Ineffective Assistance of Trial Counsel.

Gribble alleges eleven instances of ineffective assistance of trial counsel. However, as Gribble concedes, he raises ten of them for the first time in the instant habeas petition. Specifically Gribble alleges, for the first time, that his trial counsel was ineffective for failing to: (1) interview or call Rose Stoddart as a witness during trial; (2) interview or call Gail Stacy as a witness during trial; (3) interview or call Joe Boles as a witness during trial; (4) retain an expert to refute the conclusions of the medical examiner; (5) conduct an independent investigation into obtaining his codefendant's hospital records from the night in question; (6) investigate and produce the telephone and radio tape transmittals from the night in question; (7) interview his codefendant to elicit information about why her statement was false, and the reason she lied about committing the crime; (8) investigate and use character evidence during trial; (9) investigate his heavy drug and alcohol abuse from an early age; and (10) present any viable defense.

Absent unusual circumstances, a federal court should not entertain a petition for writ of habeas corpus unless the petitioner has first satisfied the exhaustion requirement of 28 U.S.C. § 2254. See 28 U.S.C. § 2254(b). Under section 2254(c), a petitioner will not be deemed to have exhausted available state remedies if he had the right under the law of the state to raise, by any available procedure, the question presented. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts."); see also *Picard v. Connor*, 404 U.S. 270, 275-276 (1971). The exhaustion requirement is rooted in considerations of comity, and is designed to protect the role of the state court in the enforcement of federal law and to prevent disruption of state judicial proceedings. *Rose v. Lundy*, 455 U.S. 509, 518 (1982); *Castille v. Peoples*, 489 U.S. 346, 349 (1989). In order for a claim to be exhausted "[b]oth the legal theory and facts underpinning the federal claim must have been presented to the state courts." *Evans v. Court of Common Pleas, Delaware County, Pennsylvania*, 959 F2.d 1227, 1231 (3d Cir. 1992). The habeas corpus petitioner has the burden of proving exhaustion of all available state remedies. *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997) (citing 28 U.S.C.A. § 2254).

To satisfy the exhaustion requirement, petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before being presented to the federal courts. *O'Sullivan*, 526 U.S. at 845. As Gribble concedes in his habeas petition, he failed to present these claims to the state courts for review. Habeas Petition ¶13 at 10 and 10 [reverse]. Consequently, these claims are not considered exhausted for the purpose of habeas review, unless Gribble's failure to

exhaust his state court remedies is excused.

A federal court may excuse the exhaustion requirement if it would be futile for the petitioner to seek relief in the state court system. *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981); *Toulson v. Beyer*, 987 F.2d 984, 986 (3d Cir. 1983) (quoting *Gibson v. Scheidemantel*, 805 F.2d 135, 138 (3d. Cir. 1986); 28 U.S.C. § 2254(b)(1)(B)(i) and (ii). The only way Gribble could present this claim in the state court at this time is by filing another PCRA petition. See *Lines v. Larkins*, 208 F.3d 153, 164 n.17 (3d Cir. 2000); see also *Fidtler v. Gillis*, 1999 WL 596940, at *3 (E.D. Pa. Aug. 9, 1999) (citing 42 PA. CONS. STAT. ANN. § 9542 (1998)) (the PCRA is the sole means for obtaining collateral relief from convictions, encompassing and replacing all other forms of relief, including habeas corpus). However, any such petition would be time-barred by the PCRA's statute of limitations. Pursuant to the amended PCRA, effective January 16, 1996, collateral actions must be filed within one year of the date the conviction at issue becomes final. 42 PA. CONS. STAT. ANN. § 9545(b)(1); see also *Lines*, 208 F.3d at 164 n.17 (noting that the Pennsylvania Supreme Court has held that the time restrictions for seeking relief under the PCRA are jurisdictional) (citing *Commonwealth v. Banks*, 726 A.2d 374, 376 (Pa. 1999)). For purposes of the PCRA, a judgment becomes final at the conclusion of *direct review*, including discretionary review in the Supreme Court of Pennsylvania and the Supreme Court of the United States, or at the expiration of time for seeking such review. 42 PA. CONS. STAT. ANN. § 9545(b)(3) (emphasis added). Gribble's direct review process concluded when the United States Supreme Court denied his petition for *certiorari* on November 16, 1998. The denial of *certiorari* started the one year clock for Gribble to file for post-conviction relief. This time expired on or

about November 17, 1999, over a decade ago.[3]  Because the statute of limitations for filing for

post-conviction relief expired, the PCRA statute of limitations would preclude Gribble from

presenting the instant claims in a PCRA petition.[4]  42 PA. CONS. STAT. ANN. § 9545(b)(1); see

generally *Campbell v. Myers*, 1999 WL 793509, at *3 (E.D. Pa. Oct. 6, 1999) (finding that

Pennsylvania state courts "consistently and regularly" apply the PCRA statute of limitations in all

cases).  As a result, exhaustion would be futile and is excused.

Although I recommend that exhaustion be excused, Gribble is considered to have

procedurally defaulted these claims because state procedural rules bar him from seeking further

relief in state courts.  *Keller v. Larkins*, 251 F.3d 408, 415 (3d Cir. 2001).  A federal court may

not consider the merits of such claims unless the petitioner establishes "cause and prejudice" to

excuse his default.  *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  Gribble claims

that he did not present these claims to the state courts because his appointed PCRA counsel was

ineffective for not raising them.  Habeas Petition ¶13 at 10 and 10 [reverse].  Gribble contends

that this is his first "available opportunity" to raise the ineffective assistance of PCRA and PCRA

---

[3] That Gribble was successful in securing relief under the PCRA in the form of a new
sentencing hearing does not change the date used to determine the finality of his judgment, and
thus does not affect the time for seeking further PCRA relief.  See *Commonwealth v. Dehart*, 730
A.2d 991, 994 n.2 (Pa. Super. 1999) (successful first PCRA petition does not reset the clock for
the calculation of the finality of the judgment of sentence for purposes of the PCRA where the
relief granted in the first petition affected his sentence only); 42 PA. CONS. STAT. ANN. § 9545(b)
("a second or subsequent petition" for post-conviction relief must be filed within one year of the
date the judgement becomes final).  Further, Gribble cannot avail himself of the doctrine of
equitable tolling, as the Pennsylvania Supreme Court has held that the period for filing a PCRA
petition is not subject to that doctrine.  *Commonwealth v. Fahy*, 757 A.2d 214, 222 (Pa. 1999).

[4] There are three exceptions to the PCRA's statute of limitations, 42 PA. CONS. STAT.
ANN. § 9545(b)(1)(I), (ii), and (iii), but Gribble fails to allege any of the limited circumstances
upon which an exception would be granted.

appellate counsel for failing to raise these claims of trial counsel's ineffectiveness. *Id.*

Counsel ineffectiveness constitutes "cause" to excuse procedural default only when "it is an independent constitutional violation." *Coleman*, 501 U.S. at 755. There is no constitutional right to an attorney in state post-conviction proceedings. Thus, an error by post-conviction counsel does not render such assistance constitutionally ineffective. *Id.* at 752 (petitioner cannot claim constitutionally ineffective assistance of counsel in state post-conviction proceedings), see also *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (defendant represented by counsel whose performance is "not constitutionally ineffective" bears the risk of attorney error resulting in procedural default). Consequently, a claim of ineffectiveness of PCRA counsel does not establish "cause" to excuse procedural default. See *Hull v. Freeman*, 991 F.2d 86, 91 (3d Cir. 1993) (ineffective assistance of post-conviction counsel cannot constitute "cause" because defendant not entitled to post-conviction counsel under the Sixth Amendment); see also *Caswell v. Ryan*, 953 F.2d 853, 862 (3d Cir. 1992) ("[i]neffectiveness of counsel does not provide sufficient cause to excuse procedural default when counsel is not constitutionally mandated.") As a result, Gribble has not shown cause and prejudice to excuse his procedural default.

Despite the fact that Gribble has failed to demonstrate cause and prejudice for the procedural default, a federal court may also consider a defaulted claim if the petitioner can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 748. To satisfy the fundamental miscarriage of justice exception, the petitioner must show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray*, 477 U.S. at 496); see *Glass v. Vaughn*, 65 F.3d 13, 16-17 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151

(1996) (assuming that the *Schlup* miscarriage of justice/actual innocence standard applied to noncapital petitioner arguing eligibility for lesser degree of guilt). To satisfy the "actual innocence" standard, a petitioner must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327; see also *Glass*, 65 F.3d at 16. Gribble makes an actual innocence argument; however, as discussed *infra*, he has failed to demonstrate that a miscarriage of justice will result if his claims are not reviewed. *Coleman*, 501 U.S. at 748; *Schlup*, 513 U.S. at 326-327. Accordingly, I recommend that these claims be dismissed as procedurally defaulted.

**B.    Claim No. 3 Subsection (i): Ineffective Assistance of Trial Counsel for Failing to Litigate two Pre-trial Motions**

Gribble claims that his trial counsel was ineffective for failing to litigate two pre-trial motions that were filed, but then withdrawn. Specifically, Gribble claims his trial counsel was ineffective for: (1) withdrawing a motion to suppress statement;[5] and (2) withdrawing a motion to sever his case from his codefendant's. For the reasons that follow, I conclude that Gribble's claim that his trial counsel was ineffective for withdrawing the motion to suppress should be dismissed as procedurally defaulted. I also conclude that Gribble's claim that his trial counsel

---

[5] The Notes of Testimony from the June 15, 1993 suppression hearing belie Gribble's claim that his trial counsel was ineffective for withdrawing the motion to suppress statement. Gribble's trial counsel withdrew the motion to suppress on the record during the motion hearing. N.T., 6/15/93, p. 11. Gribble's counsel indicated that Gribble made the decision after conferring with him. *Id.* Immediately thereafter, the suppression judge engaged in an on the record colloquy with Gribble regarding the decision to withdraw the motion. *Id.* at pp. 11-12. In response to questions from the suppression judge, Gribble confirmed, under oath, that he understood that his attorney was moving to withdraw the motion to suppress, that he understood what that meant, and that he was satisfied with his attorney's representation of him until that point. *Id.* Gribble did not avail himself of the opportunity to protest the withdrawal; he explicitly affirmed the decision.

was ineffective for withdrawing the motion to sever should be denied as without merit.

### 1. Withdrawing Motion to Suppress Statement

Gribble's claim that his trial counsel was ineffective for withdrawing the motion to suppress statement is not exhausted for purposes of habeas review. Gribble raised this claim in his PCRA petition. However, he abandoned it when he appealed the portion of the order denying PCRA relief with respect to his guilt-phase claims. On appeal, Gribble pursued only his claim that trial counsel was ineffective for withdrawing the motion to sever.

To satisfy the exhaustion requirement, petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before being presented to the federal courts. *O'Sullivan*, 526 U.S. at 845. In Pennsylvania, one complete round of the post-conviction process requires that a petitioner, at a minimum, present his claim to the Superior Court of Pennsylvania. See Pa. Supreme Ct. Order No. 218, 30, *Pa. Bull.* 2582 (May 27, 2000) (petition for allocutor not necessary for exhaustion prior to commencing federal habeas proceeding), see also *Mattis v. Vaughn*, 128 F.Supp. 2d 249 (E.D.Pa. 2001). Gribble did not pursue this claim on PCRA appeal; thus, he failed to present this ineffective assistance claim during one full round of the appellate process. It is not considered exhausted for the purpose of habeas review unless Gribble's failure to exhaust his state court remedies is excused.

For the reasons discussed above in the analysis of Gribble's other ineffective assistance of counsel claims (Section A), his failure to exhaust this claim is excused because his only avenue to raise it is through PCRA relief, which he is time-barred from pursuing. Similarly, Gribble is considered to have procedurally defaulted this claim because state procedural rules prohibit him

from seeking relief in the state courts. Moreover, he has not shown cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice to excuse the default. Accordingly, I recommend that this claim, relating to the motion to suppress statement, be dismissed as procedurally defaulted.

### 2. Withdrawing Motion to Sever

Gribble raised this claim in his PCRA petition, and in his appeal from the order denying PCRA relief with respect to his guilt-phase claims. In the instant habeas petition, Gribble asserts that the motion was "meritorious," and that the unreliability of his codefendant O'Donnell's confession, and her conflicting statements about her role in the crime, contradicted and undermined the reliability of his confession upon which his "heat of passion" defense was based. Thus, Gribble contends, he was prejudiced because his ability to present a defense was compromised by being tried jointly. As a result, contends Gribble, his trial counsel's decision to withdraw the motion constitutes ineffective assistance.

The state court docket reflects that Gribble filed a Motion to Sever that was docketed February 18, 1993. The motion was scheduled to be heard on February 19, 1993. Instead, the motion was withdrawn on that date. In his PCRA petition and on PCRA appeal, Gribble argued that his trial counsel was ineffective for withdrawing the motion. In addressing this issue on PCRA appeal, the Pennsylvania Supreme Court first concluded that the claim was previously litigated on direct appeal and thus not reviewable under the PCRA. *Gribble II*, 863 A.2d at 461-462. The Pennsylvania Supreme Court explained:

> The allegation of error underlying [Gribble's] current ineffectiveness claim is very similar to the *Bruton* claim he litigated on direct appeal. Where [Gribble] there complained of a confrontation clause issue arising from the admission of

O'Donnell's confession at the joint trial, he now alleges that counsel should have preempted the problem entirely by seeking severance. Severance (along with redaction of the confession, exclusion of the confession, limiting charges, etc.) is one of several theoretical ways in which the underlying confession/*Bruton* style issue may be addressed or remedied. Though the specific remedial precaution differs, the trial issue sought to be avoided is the same: *i.e.*, the potential for spillover prejudice arising from admission of a non-testifying co-defendant's confession in a joint trial. Thus, [Gribble's] litigation of the confrontation claim on direct appeal necessarily involved an issue that is also at the heart of [Gribble's] current underlying severance argument - *i.e.*, that the admission of O'Donnell's confession against her inculpated and thereby prejudiced [Gribble]. Consideration of [Gribble's] ineffectiveness/severance claim necessarily requires this Court to examine the potential harmful effect of O'Donnell's statement, a task we previously undertook on [Gribble's] direct appeal. *See* 703 A.2d at 437. Since our finding on direct appeal was based upon an assessment of the effect of O'Donnell's statement, and the present claim of counsel ineffectiveness could only succeed if we reached a contrary determination that the statement was, in fact, prejudicial to [Gribble], the PCRA court did not err in finding this claim to be previously litigated.

*Id.* The Pennsylvania Supreme Court further found that even if the instant ineffectiveness of counsel claim is sufficiently distinct from the confrontation clause claim raised on direct appeal "to escape the effect of the statutory previous litigation bar, the claim fails on the merits." *Id.* at 462. In reaching this conclusion, the Pennsylvania Supreme Court explained:

Here, as this Court found on direct appeal, appellant was not prejudiced by being tried jointly with O'Donnell. First, this was a bench trial. The learned trial judge is assumed to be able to separate the evidence that was admitted against the co-defendant alone and that which was admitted against [Gribble]. [Gribble's] present claim of prejudice is premised upon an assumption that the trial judge was unable to consider the evidence only for its intended evidentiary purpose. That assumption is contrary to settled law. *See Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 71 n. 19 (2003) (judge sitting as fact finder is presumed to disregard inadmissible evidence and consider only competent evidence).

Moreover, even if this Court were to indulge [Gribble's] assumption that the trial judge ignored his duty and considered O'Donnell's confession as evidence against [Gribble], this does not prove counsel's ineffectiveness in withdrawing the severance motion. As this Court found on direct appeal, O'Donnell's confession did not inculpate [Gribble], but instead tended to exonerate him. Hence, the

severance theory underlying [Gribble's] present claim of ineffective assistance of counsel fails for the same reasons [Gribble's] *Bruton* theory failed on direct appeal. *See Gribble I*, 703 A.2d at 436-37. Just as severance is not required where "one may try to save himself at the expense of another," *Chester*, 587 A.2d at 1373, neither is it required where, as here, one has tried to save the other at the expense of himself.

Furthermore, [Gribble's] contention that O'Donnell's confession detracted from the credibility of his "heat of passion" defense, and thereby provided a basis for counsel to seek severance, loses force when the actual trial record is examined. In his summation, [Gribble's] trial counsel argued to the court that O'Donnell had lied to the police, that she was incapable of killing the victim, and that [Gribble] had committed the killing in the heat of passion - *i.e.*, that [Gribble] was not guilty of first degree murder, but rather only of voluntary manslaughter. N.T., 6/30/93 at 506-07. But, [Gribble's] trial counsel also argued, in the alternative, that O'Donnell's statement could be believed and that [Gribble] was not guilty at all, *i.e.*, he did not participate in the killing. *Id.* Significantly, O'Donnell's trial counsel also argued in closing that her confession should be disbelieved. *Id.* at 509-15. O'Donnell's counsel argued that O'Donnell lacked motive; that she was incapable of killing and dismembering the victim due to the physical deformity of her hands; and that she was, in fact, innocent of the crime. *Id.* at 513-15. The potential for spillover prejudice from O'Donnell's confession was surely reduced when O'Donnell's defense challenged the contents of the confession. Because [Gribble] has not shown that he was prejudiced by the joint trial, trial counsel cannot be deemed ineffective for withdrawing the motion to sever trials.

*Id.* at 462-463.

As noted, the Pennsylvania Supreme Court held that Gribble's ineffective assistance of counsel claim was not reviewable under the PCRA because it was, in substance, decided on the merits on direct appeal, and thus previously litigated. *Id.* at 461-462. In so concluding, the Pennsylvania Supreme Court relied on 42 PA. CONS. STAT. ANN. § 9543(a)(3), which provides a procedural bar to PCRA review for claims that have been "previously litigated" or "waived." See 42 PA. CONS. STAT. ANN. § 9543(a)(3). Because Gribble's claim was barred from PCRA review as "previously litigated" on the merits on direct appeal, and not as "waived," his ineffectiveness of counsel claim is exhausted and not procedurally defaulted. Cf. *Villot v.*

*Varner*, 373 F.3d 327, 335 (3d Cir. 2004) (noting that denial of PCRA relief on basis that claim is "waived" under 42 Pa. Cons. Stat. Ann. § 9543(a)(3) is a denial on procedural grounds for procedural default purposes on habeas review). Accordingly, I will address the merits of Gribble's claim that his trial counsel was ineffective for withdrawing the motion to sever.

A review of Gribble's claim requires a determination of whether the state court's denial of his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the United States Supreme Court set forth the standard for a petitioner seeking habeas relief on the grounds of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In determining prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

"It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams*, 529 U.S. at 391. Thus, Gribble is entitled to relief if the Pennsylvania court's rejection of his claim was either "contrary to, or involved and unreasonable application of," that established law.

Despite concluding that Gribble's ineffectiveness claim was not reviewable under the PCRA, the state court addressed its merits. In reviewing this claim, the state court noted that the test for counsel ineffectiveness is the same under both Pennsylvania and federal law.[6] The state court concluded that Gribble failed to show that he was prejudiced by the joint trial; thus, trial counsel could not be deemed ineffective for withdrawing the motion to sever. *Gribble II*, 863 A.2d at 463. I find the state court's determination of Gribble's claim to be consistent with established federal law, and a reasonable application of that established law.

Denying an ineffective assistance of counsel claim based solely on a petitioner's failure to establish prejudice is consistent with established federal law. A petitioner must satisfy both the performance and prejudice prongs of the *Strickland* analysis. *Strickland*, 466 U.S. at 691. Thus, a claim of ineffective assistance of counsel will be dismissed if the petitioner makes an insufficient showing under either prong. *Id.* at 697. There is no set order in which the court must address the two prongs. *Id.* "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*; *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010). In denying this ineffective assistance

---

[6] The Pennsylvania Supreme Court has held that the Pennsylvania standard for reviewing ineffective assistance of counsel claims is identical to the standard enunciated by the United States Supreme Court in *Strickland*. *Werts*, 228 F.3d at 203 (citing *Commonwealth v. Pierce*, 527 A.2d 973, 976-77 (Pa. 1987)).

claim, the state court relied solely on Gribble's failure to establish prejudice, without addressing the performance prong of *Strickland*. This approach is a reasonable application of established federal law.

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Absent a claim of insufficiency of evidence supporting the judgment, in making the determination whether the specified actions resulted in prejudice the court should presume that the judge or jury acted according to law. *Id.* at 695.

Gribble has not demonstrated that he was prejudiced by the joint trial. As the state court recognized, Gribble's ineffective assistance claim is predicated on the purported failure of his trial counsel to protect him from being prejudiced by the admission and use of his codefendant O'Donnell's confession during a joint trial by seeking a severance. In *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held that, in a joint trial, the admission of a nontestifying codefendant's confession that incriminates the other codefendant violates the other codefendant's right to confrontation. *Id.* at 135-136. However, the *Bruton* rule was crafted to address fears that curative measures would be insufficient to ensure that even a carefully instructed jury would disregard the prejudicial statements of a codefendant during a joint trial. *See id.* (reasoning that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.") Gribble's trial was not a joint jury trial, it was a bench trial. The *Bruton* rule expressly addressed the potential for

prejudice at joint *jury* trials.  The risks caused by the "practical and human limitations of the jury" addressed in *Bruton* do not exist when a judge is the trier of fact..  Recognizing this distinction, the Third Circuit has held that the *Bruton* rule is inapplicable in the context of a joint bench trial.  See *Johnson v. Tennis*, 549 F.3d 296, 299-300 (3d Cir. 2008).  Consequently, because the prejudice recognized in *Bruton* is not present in bench trials, the *Bruton* rule is inapplicable.  Gribble cannot have been deprived of any constitutional right based on the rule announced in *Bruton*.  Accordingly, the state court's determination that Gribble failed to establish prejudice, and thus his trial counsel was not ineffective, was neither contrary to nor an unreasonable application of clearly established federal law.  Accordingly, I recommend that Gribble's claim that his trial counsel was ineffective for withdrawing the motion to sever be denied as without merit.

### C.     Claim No. 1 - Trial Judge Committed Reversible Error in Expressly Relying on a Codefendant's Confession as Evidence of Gribble's Guilt

Gribble alleges that the trial court judge used O'Donnell's confession as "corroborating evidence" to find him guilty of first degree murder.  Gribble contends that the alleged use of O'Donnell's confession as substantive evidence against him violated his Sixth Amendment right to confrontation because he did not have the opportunity to cross examine O'Donnell during trial. Gribble cites to *Lee v. Illinois*, 476 U.S. 530 (1986), arguing that when the discrepancies between confessions made by codefendants are not insignificant, one codefendant's confession may not be admitted against the other at a joint trial.  Gribble claims the facts of his case are analogous to the facts in *Lee*, and thus, as the United States Supreme Court concluded in *Lee*, the use of his

codefendant's statement resulted in a violation of the Confrontation Clause.[7]

In *Lee*, the United States Supreme Court considered whether a defendant's rights guaranteed by the Confrontation Clause were violated when, during a joint bench trial, the trial judge expressly relied on portions of a codefendant's confession to police as substantive evidence against the defendant. *Lee,* 476 U.S. at 531. It was undisputed that the trial judge explicitly used the codefendant's confession as substantive evidence to convict the defendant. This was evident in the trial judge's explanation for finding the defendant guilty, and was conceded by the State of Illinois on appeal. *Id.* at 538-539. The Illinois state court relied on *Bruton* in reaching its decision. However, the United States Supreme Court noted that "this is not strictly speaking a *Bruton* case because we are not here concerned with the effectiveness of limiting instructions in preventing spill-over prejudice to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial." *Id.* at 542. In so noting, the Supreme Court drew a

---

[7] While I conclude that Gribble's claim based upon *Lee* is procedurally defaulted, I note that the evidence Gribble offers in support of this claims does not in fact support his assertion that the trial judge actually used his codefendant's confession against him. Gribble cites to one line from the trial court's opinion. Brief in Support of Habeas Petition, pg. 2. Specifically, Gribble quotes the trial judge's statement that "[i]n addition, O'Donnell gave a statement which provides separate corroboration to the perpetration of this crime." *Id.* However, Gribble takes this quote out of context. In the section of the opinion from which this quote is lifted, the trial judge was not discussing Gribble's guilt. He was discussing Gribble and O'Donnell's assertion that a third party, O'Donnell's father, was present during the murder, and whether testimony to this effect would have had an effect on the outcome of the trial. See Trial Ct. Opinion, pp. 9-10. This is made clear by the next line in the opinion, when the trial judge concludes, "[t]he testimony of defendants as to Mr. O'Donnell's alleged role in the homicide would not have changed the result in this matter." *Id.* at 10. Thus, the quote cited by Gribble does not support his assertion. Additionally, during closing arguments, the trial judge acknowledged that he could only use each confession against the defendant who gave it. N.T., 6/30/93, pp. 509-510. Counsel for Gribble's codefendant stated in his closing, "during the course of this trial you have heard two statements." *Id.* at 509. The trial judge immediately responded, "I can only use the statements against the respective party." *Id.* at 509-510.

distinction between the two theories that could support a Confrontation Clause violation. A *Bruton* claim involves a determination of whether the *admission* of a codefendant's incriminating confession results in a violation. On the other hand, *Lee* focuses on whether a trial judge's actual use of or *reliance on* a codefendant's incriminating confession results in a violation. See *Johnson*, 549 F.3d at 300-301 (distinguishing *Lee* and *Bruton* based upon "admission" versus "reliance" issue distinction in holding that *Lee* does not extend *Bruton* to bench trials), accord *United States v. Cardenas*, 9 F.3d 1139, 1155 (5th Cir. 1993) ("The issue specifically addressed in *Lee* was whether the trial judge's reliance upon Thomas' pre-trial confession, not the admission of such a confession, violated Lee's Sixth Amendment right to confrontation. Moreover, the Court observed that *Lee* was 'not strictly speaking a *Bruton* case.'" (citing *Lee*, 476 U.S. at 531)); *Rogers v. McMackin*, 884 F.2d 252, 257 (6th Cir. 1989) (noting in *Lee* "[t]he question for decision was not whether *admission* of the codefendant's confession was constitutional error, but 'whether such *reliance* by the judge upon the codefendant's confession violated petitioner's rights. . . .'") (emphasis in original).

Gribble previously raised a Confrontation Clause claim, but he did not proceed on the theory that the *actual use* of his codefendant's confession gives rise to constitutional error as contemplated in *Lee*. Instead, Gribble pursued a *Bruton* claim based upon the potential for spillover prejudice from the admission of his codefendant's confession as evidence against his codefendant. Gribble never presented the *actual use* theory to the state courts. Thus, it was not fairly presented to the state courts, and is not exhausted for purposes of habeas review. See *O'Hallaran*, 835 F.2d at 508 ("The claim must be substantially equivalent to that litigated in the state court. Both the legal theory and the facts supporting a federal claim must have been

submitted to the state court.")

For the reasons discussed above in the analysis of Gribble's ineffective assistance of counsel claims (Section A), his failure to exhaust his claim is excused because his only avenue to raise it is through PCRA relief, which he is time-barred from pursuing. Similarly, Gribble is considered to have procedurally defaulted this claim because state procedural rules prohibit him from seeking relief in the state courts. Moreover, he has not shown cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice sufficient to excuse the default. Accordingly, I recommend that this claim be dismissed.

In the alternative, to the extent that Gribble seeks to raise a *Bruton* claim here, that issue was raised on direct appeal and denied on the merits by the Pennsylvania Supreme Court. On direct appeal, Gribble claimed that he was denied his Constitutional right of confrontation when O'Donnell's confession was introduced during the joint trial because she did not testify, and he did not have the opportunity to cross-examine her. *Gribble I*, 703 A.2d at 436. In denying Gribble's *Bruton* claim as without merit, the state court explained on direct appeal:

> The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee a criminal defendant the right to confront the witnesses against him, including the right to cross-examine those witnesses. *Commonwealth v. Spiewak*, 533 Pa. 1, 617 A.2d 696 (1992). In a joint trial, the admission of a nontestifying co-defendant's confession, which inculpates the other co-defendant, violates the other co-defendant's right of confrontation. *Bruton v. Unites States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.22 476 (1968); *Commonwealth v. Lambert*, 529 Pa. 320, 603 A.2d 568 (1992). In the present case, however, O'Donnell's confession did not inculpate Gribble. In fact, O'Donnell's confession, if believed, would completely *exculpate* Gribble from any involvement in the killing of Eleftheriou. O'Donnell told police that she, not Gribble, struck Eleftheriou in the head with a hammer and later dismembered his body. When the nontestifying co-defendant's statement does not inculpate the other co-defendant, there is no violation of the right to confrontation. *Commonwealth v. Sampson*, 454 Pa. 215, 311 A.2d 624 (1973); *Commonwealth v.*

> *Hassine*, 340 Pa.Super. 318, 490 A.2d 438 (1985), *overruled on other grounds*, *Commonwealth v. Schaeffer*, 370 Pa.Super. 179, 536 A.2d 354 (1987). Because O'Donnell's statement did not inculpate Gribble in the killing, Gribble's argument is without merit.

*Id.* at 436-437.[8]  I find the state court's denial of this claim consistent with established federal law, and is a reasonable application of that established federal law.

The state court's conclusion that there was no violation of Gribble's right to confrontation because O'Donnell's confession completely exculpated Gribble was reasonable.  In *Bruton*, the Supreme Court held that the introduction of a non-testifying codefendant's out of court confession which directly implicates his codefendant by name violates the codefendant's rights under the Confrontation Clause.  *Bruton*, 391 U.S. at 137.  The Supreme Court reached this conclusion even though the statement in that case was admitted with limiting instructions to the jury.  *Id.*  The Supreme Court reasoned, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great . . . that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135.  *Bruton* is not applicable, however, where the

---

[8] Before addressing the merits of Gribble's claim, the state court noted that ordinarily this claim would be waived since Gribble failed to object to the admission of O'Donnell's confession at trial.  *Gribble I*, 703 A.2d at 436.  Instead of dismissing the claim as waived, the state court employed the relaxed waiver doctrine for death penalty review cases, then excused the waiver and resolved the issue on the merits.  *Id.,* see *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 955 n.19 (Pa. 1982) (significant issues perceived *sua sponte* by the court or raised by the parties will be addressed and, if possible from the record, resolved even if waived by an appellant); *Commonwealth v. McKenna*, 383 A.2d 174, 179-181 (Pa. 1978) (establishing relaxed waiver rule on review in death penalty cases reasoning that there are "occasional rare situations where an appellate court must consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure.").  Subsequent to Gribble's direct appeal, the relaxed waiver doctrine as contemplated in *Zettlemoyer* was abrogated.  See *Commonwealth v. Freeman*, 827 A.2d 385, 396-403 (Pa. 2003) (reexamining and abrogating relaxed waiver doctrine as formulated in *Zettlemoyer* and reaffirming limited relaxation of waiver as contemplated in *McKenna*).  The repeal applied prospectively.  *Id.* at 403.  Thus, the holding in *Freeman* did not affect the state court's review of Gribble's claim.

extrajudicial confession of a non-testifying codefendant does not identify or "facially incriminate" any other defendant. *Richardson v. Marsh*, 481 U.S. 200, 207 (1987), see also *United States v. Belle*, 593 F.2d. 487, 493 (3d Cir. 1979) ("When a codefendant's extrajudicial statement does not directly implicate the defendant, however, the *Bruton* rule does not come into play.") Additionally, the Third Circuit has held that, by its own terms, the *Bruton* rule is inapplicable to joint bench trials. *Johnson*, 549 F.3d at 300.

Here, O'Donnell's confession does not implicate Gribble in the murder. To the contrary, it exculpated him, since she claimed sole responsibility. Further, since this trial was a bench trial presided over by a judge without a jury, *Bruton* would be inapplicable even if the statement had incriminated Gribble. Since the confession is not facially incriminating, and was introduced during a joint bench trial, *Bruton* is inapplicable and there is no Confrontation Clause violation.

As a result, I find that the state court's adjudication of Gribble's Confrontaion Clause claim is consistent with established federal law and a reasonable application of that federal law. Accordingly, to the extent Gribble seeks to raise a *Bruton* claim, I recommend this claim be denied.

### D.     Claim No. 2 - Prosecutor and Suppression Hearing Judge Error

Gribble alleges that during a suppression hearing, the judge and prosecutor erred by holding a meeting in the judge's chambers during which they - along with Gribble and O'Donnell's counsel - called a hospital to try to get records of O'Donnell's treatment at the hospital on the night of the murder. Their effort was unsuccessful. Gribble argues that the suppression judge and prosecutor "interfere[d] with an ongoing investigation" and as a result committed reversible error. Gribble raises this claim for the first time in this habeas petition.

Gribble fails to state a cognizable claim. The petitioner bears the burden of articulating his allegations clearly. See *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991). A *pro se* petitioner's allegations are held to a less stringent standard than those drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *United States v. Day*, 969 F.2d 39, 42 (3d Cir. 1992) (stating in context of habeas petition: "We must construe the allegations in Day's *pro se* petition liberally, and we may not subject his petition to the standards that we would apply to pleadings drafted by lawyers.") However, despite the liberal interpretation afforded *pro se* petitioners' claims, vague, conclusory, or general allegations are insufficient to form a basis upon which relief can be granted. See *Zettlemoyer*, 923 F.2d at 298 (citing *Mayberry v. Petsock*, 821 F.2d 179, 187 (3d Cir. 1987)).

Here, Gribble fails to clearly articulate a violation of the United States Constitution or federal law. A federal court may review a state prisoner's habeas claim only to the extent it is based upon a violation under the Constitution, law or treaty of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a). In his habeas petition, Gribble fails to identify the requisite constitutional violation, stating simply that the prosecutor and judge committed "reversible error." See Habeas Petition, ¶12(B), pg. 9. Then, in the heading for this claim in the table of contents to his brief, Gribble adds that his was denied his due process rights by the prosecutor and judge's actions. Brief in Support of Habeas Petition, pg. i. This is the only reference Gribble makes to his due process rights. In fact, when reproducing the heading as a lead-in to his discussion of this claim, he abandons the "due process" characterization, and again simply states that the judge and prosecutor committed "reversible error," adding only that their actions resulted "in important

evidence being withheld."[9]  *Id.* at 5.  Finally, in a subsequent filing, Gribble parenthetically

characterizes his claim as a "governmental interference" claim.  Petr's Reply to Response, pg. 10.

Despite the passing reference to a "due process violation" in the table of contents to his

brief, Gribble's claim, as articulated in his discussion, is simply not cast as constitutional in

nature.  Gribble does not elaborate on or explain the due process violation.  Instead, Gribble

expresses a general grievance wherein he expresses his displeasure that his attorney, O'Donnell's

attorney, the prosecutor and the judge were unable to obtain the hospital records.  See generally

Brief in Support of Habeas Petition, pp. 5-6; Habeas Petition, ¶12(B), pg. 9; Petr's Reply to

Response, pg. 10.  Gribble does not cite to case law in support of his allegation, nor does he

explain how this constitutes the denial of a right guaranteed by the United States Constitution.

Further, Gribble does not articulate facts that would inextricably lead one to conclude a

---

[9] Withholding evidence by the prosecution would implicate the United States Supreme
Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963).  *Brady* holds that "the suppression
by the prosecution of evidence favorable to an accused upon request violates due process where
the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith
of the prosecution."  *Id.* at 87.  To establish a *Brady* violation, a defendant must show:  "(1)
evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was
material to guilt or punishment."  *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).
Here, Gribble does not allege facts that implicate *Brady* as he does not allege that evidence was
suppressed.  The substance of this claim is Gribble's allegation that the prosecutor and judge
interfered with the investigation.  Petr's Reply to Response, pg. 10.  Gribble does not claim that
the prosecutor had the records but failed to produce them.  Further, other than his assertion that
the hospital records are "very important," Gribble does not allege or make a showing that the
hospital records were favorable to him, or that they were material to his guilt or punishment.
   This conclusion is supported by the transcript of the June 15, 1993 suppression hearing.
Gribble's codefendant complained that her attorney had not obtained all the records she needed
for her case, referring to her hospital records.  N.T. 6/15/93, pg. 15.  In addressing the issue, the
judge noted that, in his presence, the prosecutor and counsel for both defendants called the
hospital and attempted to obtain the records, or any other information about O'Donnell being
treated at the hospital on the night of the murder.  *Id.* at 17.  The judge explained that the inability
to obtain the records was because O'Donnell could not provide the name she was admitted under.
*Id.*  It was not due to the prosecutor suppressing the records or to any alleged interference.

Constitutional violation has been alleged, or is at the heart of his claim. Such allegations are not cognizable.[10]

In any event, even were I to conclude that this is a cognizable claim, it is not exhausted for purposes of habeas review. A federal court, absent unusual circumstances, should not entertain a petition for writ of habeas corpus unless the petitioner has first satisfied the exhaustion requirement of 28 U.S.C. § 2254. See 28 U.S.C. § 2254(b). Under section 2254(c), a petitioner will not be deemed to have exhausted available state remedies if he had the right under the law of the state to raise, by any available procedure, the question presented. For a claim to be exhausted "[b]oth the legal theory and facts underpinning the federal claim must have been presented to the state courts." *Evans,* 959 F2.d at 1231. The habeas corpus petitioner has the burden of proving exhaustion of all available state remedies. *Lambert,* 134 F.3d at 513.

To satisfy the exhaustion requirement, petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before being presented to the federal courts. *O'Sullivan*, 526 U.S. at 845. Gribble failed to present this claim to any state appellate court. Consequently, it is not considered exhausted for the purpose of habeas review unless Gribble's failure to exhaust his state court remedies is excused.

For the reasons discussed above in the analysis of Gribble's ineffective assistance of counsel claims (Section A), his failure to exhaust this claim is excused because his only avenue to raise it is through PCRA relief, which is now time-barred. Similarly, Gribble is considered to

---

[10] To the extent Gribble seeks here to raise a claim that his trial counsel was ineffective for failing to obtain the hospital records, he raised that issue as one of his eleven points of trial counsel ineffectiveness and I concluded that it is procedurally defaulted.

have procedurally defaulted this claim because state procedural rules prohibit him from seeking relief in the state courts. Moreover, he has not shown cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice to excuse the default.

Accordingly, I recommend that this claim be dismissed.

**E.    Claim No. 5 - The Petitioner's Constitutional Rights were Violated by Trial Counsel's Failure to Object to the Admission and Use of an Unredacted, Unreliable Pre-Trial Confession of A Non-Testifying Codefendant**

Gribble alleges that the admission and use of his codefendant O'Donnell's confession during trial violated his rights under the Confrontation Clause because he could not cross examine O'Donnell because she did not testify at trial. Relatedly, Gribble contends that his trial counsel was ineffective for failing to object to the admission of the confession.

### 1.    Confrontation Clause Claim

This claim is similar to the Confrontation Clause claim Gribble raised on direct appeal to the state courts. Again, Gribble complains that his right to confrontation guaranteed by the Sixth Amendment was violated when O'Donnell's confession was introduced and used during their joint bench trial because he did not have the opportunity to cross examine her about the confession. On direct review to the Pennsylvania Supreme Court, Gribble based his Confrontation Clause claim upon *Bruton*, which the state court rejected as without merit. Gribble now seeks to pursue another avenue to support a Confrontation Clause violation by relying on the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). After review, I conclude that *Crawford* is inapplicable because it does not apply retroactively. I also conclude that this claim is not exhausted for purposes of habeas review.

In *Crawford*, the United States Supreme Court overruled *Ohio v. Roberts*, 448 U.S. 56 (1980). *Crawford*, 541 U.S. at 62-66. *Roberts* allowed the admission of an out-of-court testimonial statement so long as the declarant was unavailable and the statement bore sufficient indicia of reliability, defined by the Supreme Court as either: (1) falling within a "firmly rooted hearsay exception;" or (2) showing "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66. In *Crawford*, the Supreme Court concluded that the *Roberts* rule was inconsistent with the Confrontation Clause and held that a witness' testimonial out-of-court statement is barred under the Confrontation Clause unless the witnesses is unavailable and the defendant had a prior opportunity to cross-examine him about the statement. *Crawford*, 541 U.S. at 68. In so holding, the Supreme Court concluded that the Confrontation Clause commands that the reliability of evidence admitted against a defendant be "assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. Thus, allowing the reliability of out of court statements to be determined by a judge in the process of deciding whether to admit the statement as evidence, as was allowed under *Roberts*, "is fundamentally at odds with the right of confrontation." *Id.*

Gribble cites to *Crawford* to support his claim. However, Gribble cannot seek relief under *Crawford* because it does not apply retroactively to Gribble's case. Gribble's trial was conducted, and his direct appeal became final, before the Court issued its decision in *Crawford* in 2004. The Supreme Court has held that the rule announced in *Crawford* is not retroactive to cases already final on direct review. See *Whorton v. Bockting,* 549 U.S. 406, 409 (2007). The Supreme Court further held that the rule announced in *Crawford* is procedural, not substantive, and does not fall within the exception for "watershed rules" that implicate the fundamental

fairness and accuracy of criminal proceedings, and thus does not apply retroactively in a collateral proceeding. *Id.* at 416, 421. Therefore, *Crawford* does not apply retroactively to Gribble's case. Consequently, I will not address Gribble's *Crawford* claim, and recommend that it should be denied.

Because *Crawford* does not apply retroactively to Gribble's case, he must rely on the law that governed when his direct appeal became final. As noted above, the predecessor to *Crawford* was *Roberts*. However, Gribble failed to present a Confrontation Clause challenge to the admission of his codefendant's confession based upon *Roberts* to the state courts.[11] Accordingly, to the extent that this claim can be read to implicate a *Roberts* challenge, I conclude this claim is not exhausted.

A federal court, absent unusual circumstances, should not entertain a petition for writ of habeas corpus unless the petitioner has first satisfied the exhaustion requirement of 28 U.S.C. § 2254. See 28 U.S.C. § 2254(b). Under section 2254(c), a petitioner will not be deemed to have exhausted available state remedies if he had the right under the law of the state to raise, by any available procedure, the question presented. For a claim to be exhausted "[b]oth the legal theory and facts underpinning the federal claim must have been presented to the state courts." *Evans,* 959 F2.d at 1231. This "presentation" requirement is satisfied where a petitioner presents the"substantial equivalent" of his federal habeas claims to the state courts. See *Picard*, 404 U.S. at 278 (concluding claim raised in habeas petition was not "substantial equivalent" of claim

---

[11] Gribble did raise a claim under *Roberts* in his counseled appeal from the portion of the order denying him PCRA relief. However, that *Roberts* claim was limited to the admission of Agnes McClinchey's testimony about statements made to McClinchey by O'Donnell. Appellant's Brief on PCRA Appeal, pp. 17-20. O'Donnell's confession to the police at issue in the instant claim was not the subject of the *Roberts* claim Gribble raised in his PCRA appeal.

presented to state courts and thus not exhausted).  Claims arising under the same federal

constitutional provision are not substantially equivalent where they arise in different contexts.

See *Grey v. Netherland*, 518 U.S. 152, 164-165 (1996) (concluding that a petitioner's due

process challenge based upon "notice-of-evidence" and "misrepresentation" claims presented

two separate claims for exhaustion purposes because they arise in different contexts).

While Gribble raised a Confrontation Clause claim on direct appeal, he did not challenge

the admission of his codefendant's confession based upon *Roberts*.  Instead, Gribble pursued

only a *Bruton* claim.  Like *Bruton* and its progeny, the *Roberts* and *Crawford* line of cases define

the rights guaranteed by the Confrontation Clause of the Sixth Amendment.  However, they are

substantively different: claims under each line of cases arise under different contexts, because

they address difference core concerns.  *Crawford* and *Roberts* are concerned with the

circumstances under which out of court statements may be admitted as evidence against a

defendant.  See generally, *Roberts*, 448 U.S. at 62-67; *Crawford*, 541 U.S. at 42-69.  Thus, each

addressed whether hearsay statements may be admitted in the first instance.  *Bruton* and its

progeny are concerned with whether a nontestifying codefendant's confession, properly admitted

as evidence against the codefendant but which facially incriminates the defendant, is prejudicial

to the defendant during a joint jury trial.  *Bruton*, 391 U.S. at 135-137.  Thus, the *Bruton* line of

cases established rules designed to protect a defendant from the potential spillover prejudice

resulting from the introduction of an otherwise properly admitted confession against his

codefendant.  See *Bruton*, 391 U.S. at 135-137 (holding that a defendant's Sixth Amendment

right to confront witnesses is violated by the introduction of a nontestifying codefendant's

confession that directly implicates the defendant, despite limiting instruction to jury); see also

e.g. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (holding that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession when the confession is redacted to eliminate the defendants name and any reference to the defendants existence, and the jury is instructed not to use the codefendant's confession against the defendant); *Gray v. Maryland*, 523 U.S. 185, 196  (1998) (holding that nontestifying codefendants' confessions which are redacted by "substitut[ing] blanks and the word "delete" for the [defendant's] name falls within the class of statements to which *Bruton*'s protections apply").  Because claims brought under *Roberts* and *Bruton* arise in different contexts and address different substantive concerns, they present different theories upon which a Confrontation Clause violation may be based.  Therefore, presenting a *Bruton* claim to the state courts is not the same as presenting a claim based on *Crawford*, or its predecessor *Roberts*.

 Since Gribble did not raise this claim during his state court proceedings, I conclude this issue was not fairly presented to the state courts, and is not exhausted for purposes of habeas review.  See *O'Hallaran*, 835 F.2d at 508 ("The claim must be substantially equivalent to that litigated in the state court.  Both the legal theory and the facts supporting a federal claim must have been submitted to the state court.")

For the reasons discussed above in the analysis of Gribble's ineffective assistance of counsel claims (Section A), his failure to exhaust this claim is excused because his only avenue to raise it is through PCRA relief, which is now time-barred.  Similarly, Gribble is considered to have procedurally defaulted this claim because state procedural rules prohibit him from seeking relief in the state courts and he has not shown cause and prejudice.  Moreover, Gribble has not shown that failure to consider the claim will result in a fundamental miscarriage of justice

sufficient to excuse the default. Accordingly, I recommend that the *Crawford* claim be dismissed.

### 2. Ineffective Assistance of Counsel

Gribble's claim that his trial counsel was ineffective for not objecting to the admission of O'Donnell's confession is not exhausted for purposes of habeas review. Gribble raised this claim in his Supplemental Amended PCRA petition. However, he abandoned it when he appealed the portion of the order denying PCRA relief with respect to his guilt-phase claims. On appeal, Gribble pursued a claim that trial counsel was ineffective for failing to object to the admission of Agnes McClinchey's testimony about statements O'Donnell made to McClinchey. Gribble did not include his trial counsel's failure to object to the admission of O'Donnell's confession in that claim (or in any other claim) on PCRA appeal.

In order to satisfy the exhaustion requirement, petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before being presented to the federal courts. *O'Sullivan*, 526 U.S. at 845. In Pennsylvania, one complete round of the post-conviction process requires that a petitioner, at a minimum, present his claim to the Superior Court of Pennsylvania. See Pa. Supreme Ct. Order No. 218, 30, *Pa. Bull.* 2582 (May 27, 2000) (petition for allocator not necessary for exhaustion prior to commencing federal habeas proceeding), see also *Mattis v. Vaughn*, 128 F.Supp. 2d 249 (E.D.Pa. 2001). Gribble did not present this ineffective assistance claim to any state appellate court. Consequently, it is not considered exhausted for the purpose of habeas review unless Gribble's failure to exhaust his state court remedies is excused.

For the reasons discussed above in the analysis of Gribble's other ineffective assistance of counsel claims (Section A), his failure to exhaust this claim is excused because his only avenue to raise it is through PCRA relief, which is now time-barred. Similarly, Gribble is considered to have procedurally defaulted this claim because state procedural rules prohibit him from seeking relief in the state courts and he has not shown cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice to excuse the default. Accordingly, I recommend that this claim be dismissed.

### F.      Claim No. 4 - Actual Innocence

The United States Supreme Court created a sequencing requirement for courts considering "actual innocence" claims. Before addressing an actual innocence claim, a court "must first address all nondefaulted claims or comparable relief and other grounds for cause to excuse the procedural default." *Dretke v. Haley*, 541 U.S. 386, 394 (2004). Having addressed Gribble's nondefaulted claims and grounds raised for cause to excuse his procedural default, I will now turn to Gribble's actual innocence claim.

Where, as is the case here, a petitioner fails to demonstrate cause and prejudice to excuse his default, a federal court may still review the merits of a defaulted claim if "the [petitioner] can demonstrate . . . that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In this context, a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (citing *Harrera v. Collins*, 506 U.S. 390, 404 (1993)). Thus, Gribble may obtain review of his procedurally defaulted claims only if he falls within the "narrow class of cases . . . implicating a

fundamental miscarriage of justice." *McClesky v. Zant*, 499 U.S. 467, 494 (1991). The fundamental miscarriage of justice exception to a procedural default is limited to cases of actual innocence. See *Schlup*, 513 U.S. at 321-322 (discussing necessary link between miscarriage of justice exception and a petitioner's innocence). The *Schlup* standard "is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006).

In order to establish a miscarriage of justice sufficient to overcome a procedural default, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup,* 513 U.S. at 327 (quoting *Murray*, 477 U.S. at 496). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). The Supreme Court explained, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup*, 513 U.S. at 324. Further, the Supreme Court emphasized that

> [t]he meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Id.* at 329.

Gribble claims he is entitled to relief because he is actually innocent of first degree

murder and guilty of "nothing more than a crime of passion or voluntary manslaughter."[12]  Brief

in Support of Habeas Petition, p. 35.  As laid out in his habeas petition, Gribble's claim is

ambiguous as to whether he is pursuing actual innocence as a stand-alone claim for relief or as a

gateway claim through which he seeks to have his procedurally defaulted claims decided on their

merits.  In a subsequent filing, Gribble clarifies that he is asserting an actual innocence claim

solely as a means to show a fundamental miscarriage of justice sufficient to overcome his

procedural default.  Petr's Reply to Response, pp. 3, 5.

The Third Circuit Court of Appeals established a two-step inquiry for deciding claims of

actual innocence.  See *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004); *Goldblum v. Klem*,

510 F.3d 204, 225 (3d Cir. 2007) (reaffirming two-step inquiry).  First, a court must decide

"whether the [petitioner] has presented new reliable evidence . . . not presented at trial."

*Hubbard*, 378 F.3d at 340.  Second, if the petitioner presents new evidence, then a court must

determine "whether it is more likely than not that no reasonable juror would have convicted him

in light of the new evidence."  *Id.*  Accordingly, I will address the new evidence inquiry first.

The Supreme Court stated in *Schlup*, "[w]ithout any new evidence of innocence, even the

---

[12] The issue of whether the actual innocence standard applies to a claim of a lesser degree of guilt is unresolved and Gribble has not cited any authority stating otherwise.  However, the Third Circuit has assumed, without resolving the question, that the "actual innocence test applies in a non-capital case where 'there is evidence that defendant committed the crime but argues that he or she was responsible for a lesser degree of guilt.'" *Sweger v. Chesney*, 294 F.3d 506, 522 n.17 (3d Cir. 2002) (quoting *Glass*, 65 F.3d at 16); see also *In Re Minarik*, 166 F.3d 591, 607 (3d Cir. 1999) ("We further assume that 'actual innocence' of the crime charged would include the situation where the new evidence would show the petitioner not guilty of first degree murder, though guilty of some lesser offense."); *Cristin v. Brennan*, 281 F.3d 404, 421-22 and n.17 (3d Cir. 2002) (noting without resolving the issue within context of addressing claim of actual innocence of sentence).  I will similarly assume for the purpose of this opinion that the actual innocence test applies.

existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316.[13]  Gribble offers the following items of evidence in support of his actual innocence gateway claim: (1) testimony from Gail Stacy; (2) testimony from Rose Stoddart; (3) information from the autopsy report; (4) the 911 audio and tape transmittals from the night of the murder; (5) testimony from Joe Boles; (6) his codefendant's hospital records from the night of the murder; and (7) the trial judge's alleged reliance on Gribble's codefendant's confession in determining his guilt.[14]  Brief in Support of Habeas Petition, p. 37.  Both parties agree that to meet the *Schlup* standard, a petitioner must furnish "new reliable evidence . . . that was not presented at trial," but they propose different standards for ascertaining whether a particular item of evidence qualifies as "new reliable evidence."  Gribble focuses on the "not presented at trial" language, and argues that a petitioner meets the *Schlup* new evidence requirement if he furnishes reliable evidence that was not presented to the trier of fact, whether it was available at trial or not.  See Petr's Reply to Response to Petr's Reply, p. 2-3; Petr's Reply to Response, pp. 3-7.  In support of this interpretation of *Schlup*, Gribble relies on the Seventh

---

[13] There is one limited exception to the requirement of producing new evidence where a subsequent interpretation of a criminal statute by the United States Supreme Court may render the petitioner not guilty.  See generally *United States v. Garth*, 188 F.3d 99 (3d Cir. 1999).  However, this exception is not applicable on the facts here.

[14] Gribble states that the "new reliable evidence" that supports his claim includes, "but is not limited to," the seven items he specifically identified.  Brief in Support of Habeas Petition, p. 36.  To the extent this implies that Gribble believes other items of evidence support his actual innocence claim, he has not identified them.  I will limit my consideration of this claim to those items Gribble specifically identified.  The petitioner bears the burden of satisfying the actual innocence standard.  Thus, it is the petitioner's responsibility to identify all the items of evidence that he believes support his claim.

Circuit Court of Appeals' Opinion in *Gomez v. Jaimet*, 350 F.3d 673 (7th Cir. 2003) and cites further to *Tice v. Wilson*, 425 F.Supp. 2d 676 (W.D. Pa. 2006) a Western District of Pennsylvania District Court Opinion. Consistent with his formulation of "new reliable evidence," Gribble asserts that he has satisfied this requirement because the items of evidence he points to were not presented to the judge during his trial. In contrast, Respondent argues that Gribble's interpretation of *Schlup* is at odds with Third Circuit precedent which holds that to be new, evidence must not have been available at the time of trial. Resp. to Pet'r Reply, pp. 3, 7. Thus, according to Respondent, the evidence Gribble offers is not "new reliable evidence" under *Schlup* because it was available to him at trial. *Id.* at 8.

The parties' respective positions mirror a disagreement among the circuits with respect to the meaning of "new reliable evidence" under *Schlup*. The disagreement is characterized by circuits that conclude the *Schlup* standard allows a petitioner to offer evidence that was not presented to the trier of fact, i.e. "newly presented evidence," versus circuits that conclude that *Schlup* requires a petitioner to offer evidence that was not available at trial. Compare *Gomez v. Jaimet*, 350 F.3d 673, 679-680 (7th Cir. 2003) (concluding that "if a petitioner comes forth with evidence that was genuinely not presented to the trier of fact then no bar exists to the habeas court evaluating whether the evidence is strong enough to establish the petitioner's actual innocence.") and *Griffin v. Johnson*, 350 F.3d 956, 961-963 (9th Cir. 2003) (holding "that habeas petitioners may pass *Schlup*'s test by offering "newly presented" evidence of actual innocence."), with *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005 ) ("Evidence is only new if it was 'not available at trial and could not have been discovered earlier through the exercise of due diligence.'" (quoting *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001))). Other circuits

acknowledge the disagreement but have declined to weigh in.  See *Wright v. Quarterman*, 470

F.3d 581, 591 (5th Cir. 2005) (acknowledging circuit split but declining to address it).

When analyzing whether evidence is "new" under *Schlup*, the Third Circuit Court of

Appeals has focused on whether the evidence was available at trial.  *Hubbard*, 378 F.3d at 341,

see also *Wright*, 470 F.3d at 591 (noting the Third Circuit requires new evidence that was not

available at the time of trial (citing *Hubbard*, 370 F.3d at 340)).  In *Hubbard*, prior to indictment,

the petitioner "included in his Bill of Alibi Particulars, which he filed as a matter of record . . . a

statement that place[d] him too far from the city where the crime was committed to have

participated in it."  *Hubbard*, 378 F.3d at 340.  However, the petitioner did not testify at trial

even though he was available to do so.  *Id.*  He offered his statement that he was not in the city

where the crime was committed as support for his actual innocence claim.  The Third Circuit

concluded that "[a] defendant's own late-proffered testimony is not 'new' because it was

available at trial."  *Id.*  Thus, the Third Circuit's application has been in line with the approach

adopted by the Eighth Circuit.  See *Osborne,* 411 F.3d at 920; *Amrine*, 238 F.3d at 1028.

Indeed, recently, the Third Circuit explicitly adopted the Eighth Circuit's definition that

"evidence is new only if it was not available at trial and could not have been discovered earlier

through the exercise of due diligence."  See *Houck v. Stickman*, No. 05-4580, slip op. at 15 (3d

Cir. November 17, 2010).  The Third Circuit compared the Seventh Circuit's approach to new

evidence as defined in *Gomez*, the case relied upon by Gribble, with the Eighth Circuit's

approach as defined in *Amrine*.  *Id.* at 13-15.  In its discussion, the Third Circuit was cognizant of

the potential dilemma a petitioner faces where "the petitioner claims he had ineffective assistance

of counsel by reason of his attorney not discovering exculpatory evidence when the petitioner is

relying on that very evidence as being the evidence of actual innocence in a gateway [claim] to reach the ineffective assistance of counsel claim." *Id.* at 14. This dilemma was specifically addressed by the Seventh Circuit in *Gomez*. See *id.* (noting Third Circuit is not the first court to address this dilemma). After reviewing the two approaches, the Third Circuit explicitly rejected the Seventh Circuit's definition of new (i.e. "newly presented") as "too expansive." *Id.* at 15. Instead, the Third Circuit adopted the available at trial standard, but modified the Eight Circuit's definition to address the petitioner's dilemma. *Id.* Thus, the Third Circuit stated that "we are inclined to accept the [Eight Circuit's] definition of new evidence with the narrow limitation that if the evidence was not discovered for use at trial because trial counsel was ineffective, the evidence may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence."[15] *Id.*

Additionally, prior to the Third Circuit's clarification of the new evidence standard, district courts within the Third Circuit had applied the available at trial rule articulated in *Hubbard*. See *Ragan v. Horn*, 598 F. Supp.2d 677, 676 (E.D. Pa. 2009)(J. Brody) (bystander's statement to police is not new for actual innocence purposes because it was available at the time of trial); *Melton v. Shannon*, 2004 WL 2755549, *5 (E.D. Pa. Nov. 30, 2004)(J. Stengel)(concluding two affidavits and a codefendant's confession are not new because they were available at trial). Accordingly, Gribble's position that *Schlup* requires only that evidence was not presented to the trier of fact to qualify as "new reliable evidence" is not the standard

---

[15] In *Houck*, the Third Circuit concluded it did not need to apply the standard it had just articulated. *Houck*, No. 05-4580 at 16. Instead, the Court "assumed without deciding" that the petitioner's proffered evidence was new evidence, and concluded that "even taking into account [the new evidence, petitioner] has not demonstrated that no reasonable juror would convict him after considering the newly supplemented record. *Id.*

applied in the Third Circuit.

In light of the interpretation of "new" evidence as applied by the Third Circuit in *Hubbard*, I conclude that, except for his codefendant's hospital records, the items of evidence offered by Gribble are not "new." Initially, I note that item 7, which Gribble characterizes as the trial judge's alleged reliance on his codefendant's confession in determining his guilt, is argument and not the kind of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" contemplated under *Schlup*.[16] See *Schlup*, 513 U.S. at 324. Thus, it is not "new reliable evidence."

Five of the remaining six items of evidence identified by Gribble - the statements from Gail Stacey, Rose Stoddart and Joe Boles, the autopsy report and 911 and radio transmittal tapes - do not qualify as "new reliable evidence" under *Schlup* because they had been discovered and were all available to Gribble and his counsel at the time of trial. *Hubbard*, 378 F.3d at 340, *Houck*, No. 05-4580 at 15. With respect to Gail Stacy and Rose Stoddart, Gribble does not provide sworn affidavits from these potential sources of testimony. Instead, he recounts portions of their statements to the police with no further support as to what the substance of their testimony might be. With respect to Joe Boles, who is deceased, Gribble relies on the testimony he gave during the Post-Trial Motion Hearing. However, it is clear that their testimony is not new evidence, because each gave a statement to the police after the murder, a fact that is acknowledged by Gribble in his discussion of his claim of trial counsel ineffectiveness for not calling these potential witnesses. Brief in Support of Habeas Petition, pp. 8, 12 and 14. These

---

[16] This argument is the basis for one of Gribble's claims for relief, which I have already concluded should be denied.

statements would have been passed during discovery.  Thus, Gribble was aware of the existence and substance of their statements before his trial.  Further, Gribble offers no proof that any of these individuals were not available to testify at his trial.  To the contrary, he alleges that Rose Stoddart and Gail Stacey were willing to testify had they been called.  Additionally, as the trial court noted in its opinion, Joe Boles testified during a Post-Trial Motion hearing.  Trial Ct. Opinion, pp 8-9; N.T. 5/3/1994, pp. 5-9.  Since the potential testimony Gribble offers was available to him at the time of trial it is not "new reliable evidence."

Gribble also offers "the evidence from the [a]utopsy [r]eport" which he characterizes as proving "there was a face to face confrontation."   Brief in Support of Habeas Petition, p. 36. Gribble asserts that this corroborates his version of events by eliminating Respondent's theory that he was lying in wait. *Id.*  However, the autopsy report was available to him at trial. Consequently, it does not meet the definition of "new reliable evidence."  Moreover, the medical examiner who performed the autopsy testified during trial.  N.T. 6/29/93, pp. 342-397.  He testified on direct examination, and was subject to cross-examination by both counsel for Gribble and for O'Donnell about the substance of his report and his conclusions.  *Id.*  Through his testimony, the substance of his report was part of the record.  Accordingly, because the autopsy report was available at the time of trial and the medical examiner who performed the autopsy testified during trial, the autopsy report is not "new reliable evidence."

Gribble next offers the 911 radio and tape transmittals from the night of the murder.  The Notes of Testimony from June 30, 1993, confirm that these radio and tape transmittals were available at the time of trial, as counsel for O'Donnell sought to use them at trial.  N.T. 6/30/93, pp. 469-473.  The trial judge prohibited their use based on evidentiary concerns, instead

permitting counsel to call as a witness the fire paramedic who responded to the call. *Id.* Because these records were available at the time of trial they are not "new reliable evidence."

The last item of evidence offered by Gribble is O'Donnell's hospital records. Determining whether these records are "new reliable evidence" potentially implicates the "narrow limitation" articulated in *Houck*. Not only does Gribble offer the hospital records as proof of his actual innocence, but he also claims his trial counsel was ineffective for failing to investigate and obtain them. Brief in Support of Habeas Petition, pg. 20-22. This ineffective assistance of counsel claim is procedurally defaulted, and one which Gribble seeks to have reviewed on the merits through proving his actual innocence to demonstrate a miscarriage of justice. Under *Houck*, the hospital records "may be regarded as new" if they were not discovered because Gribble's trial counsel was ineffective for failing to obtain them. *Houck*, No. 05-4850 at 15. As the *Houck* opinion implies, and as is the case here, this determination requires addressing a procedurally defaulted claim on its merits in the process of determining whether Gribble has proven his actual innocence in order to overcome the procedural bar to addressing that same claim. *Id.* at 15 n.13 ("sometimes a court must get ahead of itself and address issues relating to the merits of apparently procedurally barred claims in a determination of whether a petitioner's claims meet the threshold [AEDP] and abuse-of-the-writ second petition standards governing whether procedurally barred claims may be considered.") As I noted in footnote fifteen, the Third Circuit concluded it did not need to engage in this analysis in *Houck*. Consequently, *Houck* does not provide any guidance as to how a court is to engage in this analysis.

It is not necessary to address this uncertainty, however, because even if I were to conclude that the hospital records are "new reliable evidence," I cannot conclude that under the

second step in the actual innocence analysis it is more likely than not that no reasonable juror would have convicted Gribble in light of the hospital records. See *Hubbard*, 378 F.3d at 340 (holding that if a petitioner presents new reliable evidence the court must then determine "whether it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.") Therefore, as the Third Circuit did in *Houck*, for the purpose of addressing Gribble's actual innocence claim, I will assume that the hospital records are "new reliable evidence" and proceed to the second prong of the actual innocence analysis.

In making the second inquiry, a court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," and "assess how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538 (internal quotation marks and citation omitted). "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. Thus, for Gribble to prevail, I must be persuaded that in light of the "old" evidence presented at trial and the "new" evidence (here, the hospital records), no juror acting reasonably would have voted to find Gribble guilty of first degree murder, but instead would have found him guilty of a crime of passion or voluntary manslaughter.

Gribble argues that the hospital records prove that O'Donnell was at a local hospital and not present for the dismembering of the victim, as argued by the Commonwealth during trial. Brief in Support of Habeas Petition, pp. 36-37. Gribble does not discuss how this establishes his actual innocence, or how in light of this piece of information no reasonable juror would find him

guilty of first degree murder. Gribble argues further that the hospital records help prove there was no conspiracy between him and O'Donnell. *Id.* at 37. This latter argument is stated in conclusory fashion with no further explanation or support. After review, I conclude that Gribble has failed to meet his burden. The hospital records do not bear upon Gribble's guilt, and the information within the hospital records, which established when O'Donnell was taken to the hospital, is cumulative.

The hospital records establish that O'Donnell was taken to the hospital on the night of the murder, and document the time she was transported to and discharged from the hospital. During the Post-Trial Motion hearing on May 3, 1994, O'Donnell's counsel produced the hospital records, noting that they indicate that O'Donnell was transported to the hospital on the night of the murder at 3:00 a.m., treated and then released two and one half hours later at 5:30 a.m. N.T., 5/3/94, p. 25. This proves that for at least a two and one half hour period of time, O'Donnell was not present at the apartment where the victim was murdered. However, this information is cumulative of testimony elicited during trial, and would therefore not materially change the record.

During trial, counsel for O'Donnell called Barry Townsend ("Townsend") as a witness. N.T., 6/30/1993, p. 473. Townsend testified that he was a "fire service paramedic" and that on the night of the murder, he responded to a 911 call at 3123 Richmond Street, the location of the murder. *Id.* at 473-475. Referring to his report, Townsend testified that the 911 call was received at 2:59 a.m. and that he arrived on the scene at 3:05 a.m. *Id.* at 475. Townsend recalled that he transported a woman from the 3123 Richmond Street location to Northeast Hospital, transferred her to the emergency room staff, and then left 30 minutes later. *Id.* at 476-478. Thus,

the fact that O'Donnell was taken to the hospital, and the time she was transported to the hospital was established through the testimony of Townsend and was part of the record considered by the factfinder. The only information contained in the hospital records that was not introduced at trial is O'Donnell's time of discharge. This detail is, however, irrelevant with respect to Gribble's participation in the murder, because the time when O'Donnell returned to the Richmond Street location is immaterial to Gribble's prior acts. Similarly, the hospital records do not bear upon the existence of a conspiracy between Gribble and O'Donnell to murder the victim, nor does it provide any evidence that Gribble lacked the intent required to sustain a conviction of first degree murder.

I cannot conclude that no reasonable juror would acquit Gribble of first degree murder after considering the evidence presented at trial along with the hospital records. Consequently, Gribble has failed to make a showing of actual innocence and thus has failed to demonstrate that a miscarriage of justice will result if his otherwise procedurally defaulted claims are not reviewed. Accordingly, Gribble's procedurally defaulted claims will not be reviewed on their merits.

Therefore, I make the following:

# R E C O M M E N D A T I O N

AND NOW, this \_\_\_19TH\_\_\_ day of November, 2010, IT IS RESPECTFULLY

RECOMMENDED that the petition for writ of habeas corpus be DENIED.  There has been no

substantial showing of the denial of a constitutional right requiring the issuance of a certificate of

appealability.  Petitioner may file objections to this Report and Recommendation.  See Local Civ.

Rule 72.1.  Failure to timely file objections may constitute a waiver of appellate rights.


BY THE COURT:


 /s Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE