**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**WILLIAM GRIBBLE**

**v.**

**LOUIS FOLINO, et al,**

**CIVIL ACTION
NO. 09-2091**

<u>**MEMORANDUM**</u>

**SCHMEHL, J.   /s/  JLS**                                  **JULY  26, 2024**

Before the Court are Objections from Petitioner and the Commonwealth of

Pennsylvania (the "Commonwealth") to the Report and Recommendation ("R &

R") of United States Magistrate Judge Lynne A. Sitarski that recommended that

Petitioner's Petition for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254

should be denied. For the reasons that follow, the Petitioner's Objections are

sustained and the Commonwealth's Objection is overruled.

The Magistrate Judge summarized the facts of this case as follows:

> [I]n early November of 1992, [Petitioner], an admitted
> drug addict, and his girlfriend, O'Donnell, were staying
> in an apartment at 3123 Richmond Street in
> Philadelphia. The apartment belonged to Agnes
> McClinchey (McClinchey), who had given [Petitioner]
> and O'Donnell permission to stay in the apartment
> while she traveled to western Pennsylvania. James
> Mathews (Mathews), an elderly friend of McClinchey
> who drank heavily, also resided in the apartment.
>
> At approximately 10:00 p.m. on Wednesday,
> November 11, 1992, O'Donnell arrived at a pizza shop
> that [Eleftherious] Eleftheriou managed. O'Donnell
> offered to pawn a leather jacket to Eleftheriou in

exchange for ten dollars. An employee of the pizza shop observed Eleftheriou remove a "whole lot of money" in a roll from his pocket to pay O'Donnell for the jacket. O'Donnell and Eleftheriou then made arrangements to meet later that evening. After closing the pizza shop at 1:00 a.m. on November 12, 1992, Eleftheriou left in his car to meet O'Donnell. He met O'Donnell on a street corner and accompanied her to the apartment at 3123 Richmond Street.

In a sworn confession later given to police, [Petitioner] stated that he arrived at the apartment at approximately 2:00 a.m. and saw Eleftheriou and O'Donnell on the couch together. Mathews was asleep in a back room. According to [Petitioner], Eleftheriou "was feeling all over" O'Donnell. [Petitioner] then "freaked." He hit Eleftheriou once with his fist, grabbed a hammer that was resting on a television, and beat Eleftheriou approximately ten or fifteen times with the hammer until Petitioner "knew [Eleftheriou] was dead." [Petitioner] claimed that O'Donnell left the apartment at some point during the attack on Eleftheriou. Next, [Petitioner] dragged Eleftheriou's body behind the house, covered him with a piece of plywood, and returned to the house to decide what to do. A short time later, [Petitioner] uncovered Eleftheriou's body, dropped him through an access hole into the basement, and began to dismember the body. While [Petitioner] was carving apart the body, O'Donnell returned to the apartment and said she was sick. O'Donnell telephoned police, who dispatched a rescue squad to the apartment. After the rescue squad arrived and transported O'Donnell to the hospital, [Petitioner] said he returned to the basement and finished dismembering Eleftheriou. [Petitioner] also admitted that he cut off Eleftheriou's penis "for spite." He then bagged the body parts and cleaned the basement. O'Donnell came back from the hospital a few hours later and she and [Petitioner] went to sleep.

According to [Petitioner]'s confession, they awoke early on the morning of Thursday, November 12, 1992, and he loaded the body into Eleftheriou's car. He drove to Delaware Avenue in Philadelphia and threw half of the bags from the car into a dump site. [Petitioner] said he then took the remainder of the bags back to the

apartment and he and O'Donnell went to sleep. [Petitioner] also admitted that he took money and a credit card from Eleftheriou's wallet, and later that evening, he and O'Donnell drove to a children's clothing store in Philadelphia, where O'Donnell used Eleftheriou's credit card to purchase clothing for [Petitioner]'s children.

On the morning of Friday, November 13, 1992, Philadelphia police received a report that someone had found human body parts in a trash dump in the 3900 block of North Delaware Avenue. When they arrived on the scene, they found a blood stained quilt and a left arm next to a trash bag. Inside another nearby trash bag, they found a torso with the head missing. In a smaller bag there was a bloodcovered head, with the left eye missing. A short distance away, police found a right arm inside another bag. These body parts were later identified as belonging to Eleftheriou. Among papers strewn around the site, police found a letter addressed to Agnes McClinchey, 3123 Richmond Street, Philadelphia.

Later on November 13, 1992, McClinchey returned to 3123 Richmond Street from western Pennsylvania. She found blood on the front door and a stain on the carpet. She also noticed that the walls were cleaner than when she left. O'Donnell told McClinchey that she and [Petitioner] were involved in a murder and that the victim's head had been found on Delaware Avenue. McClinchey also heard O'Donnell tell [Petitioner] to burn the car. When [Petitioner] returned from this task, O'Donnell said to him "[t]hank God, you didn't get caught." That same evening, police received a report of a car fire on D Street. When police and fire fighters arrived on the scene, they found a car in flames. After extinguishing the fire, police examined the interior of the car and found two human legs and the lower portion of a male torso with its penis missing. The body parts were later identified as belonging to Eleftheriou.

McClinchey subsequently called the police, who interviewed her at a gas station near her apartment. The police then went to her apartment and arrested [Petitioner] and O'Donnell. A search of the basement revealed, among other things, a serrated kitchen knife,

a chisel, and a claw hammer, each containing traces of human tissue and blood. Stuffed inside a pipe, police found a pencil case containing a human eye and a penis. Police took [Petitioner] and O'Donnell into custody for questioning. After waiving their rights, [Petitioner] and O'Donnell gave their separate statements confessing to the murder of Eleftheriou.

At trial, an assistant medical examiner testified that there were numerous abrasions on Eleftheriou's head that were consistent with blows from a hammer. The injuries to Eleftheriou's head indicated that he was not moving when most of the blows were inflicted. The assistant medical examiner also testified that red abrasions at the site where the head and right arm were sawed off indicate that the heart was still beating when those body parts were severed. He further testified that it would have taken two people working together to dismember Eleftheriou's body in the estimated fifteen minutes before he bled to death.

(R & R, ECF 144 at 1-3) quoting *Com. v. Gribble*, 703 A.2d 426, 429–31 (Pa. 1997).[1]

On June 30, 1993, following a joint bench trial, Petitioner and O'Donnell were each convicted of first-degree murder. *Id.* at 428. Petitioner was also convicted of criminal conspiracy, possessing instruments of crime, robbery, theft by unlawful taking, unauthorized use of an automobile, arson, risking catastrophe, forgery, abuse of a corpse, and credit card fraud. *Id.* Following a non-jury penalty hearing that same day, Petitioner was sentenced to death. *Id.* The Pennsylvania Supreme Court affirmed Petitioner's conviction and death

---

[1] O'Donnell also gave a statement to police in which she confessed that she alone killed the victim by hitting him over the head with a hammer. She stated that Petitioner was asleep in the basement at the time of the killing and that she alone dragged the body into the basement and that she alone dismembered the body. N.T. 6/29/93 at 273-274. O'Donnell apparently had serious burn deformities on her hands which she showed to the trial judge during trial. N.T. 6/29/93 at 506.

sentence on November 20, 1997, *id*. at 441, and the United States Supreme Court denied his petition for writ of certiorari. *Gribble v. Pennsylvania*, 525 U.S. 1005 (1998).

At no time during Petitioner's trial did his trial counsel seek to call any witnesses, including McClinchey's upstairs neighbor, Joseph Boles ("Boles"). Nor did Petitioner's trial counsel cross-examine the assistant medical examiner, Dr. Edwin Lieberman ("Dr. Lieberman"), as to his testimony on direct that red abrasion marks at the spot where the victim's neck and arm were severed indicated that the dismemberment took place immediately while the heart was still beating and since the heart would only beat for "15 minutes or so," the dismemberment of the victim's body could have only been performed by two individuals working together. N.T. 6/29/93 at 361-362. The prosecutor seized on this testimony in formulating his theory that because of the speed and teamwork it would have taken to dismember the victim's body, Petitioner and O'Donnell must have formulated a premeditated plan to rob and murder the victim.  N.T. 6/30/93 at 517. Petitioner's trial counsel also did not cross-examine Dr. Lieberman as to his findings in his post-mortem report that injuries on the victim's face were consistent with fist-marks and a fracture of the victim's wrist was consistent with a parry fracture that often results from using the wrist to protect the face.

At a post-verdict hearing, Petitioner was represented by the same trial counsel. O'Donnell was represented at the hearing by new counsel who called Boles as a witness. Boles had been interviewed pretrial by the police and his call

was recorded by the 911 system. Boles testified that the morning of the killing, he heard "banging and noise and something banging on the wall." N.T. 5/3/94 at 6-7. Soon after he heard a woman screaming, "Daddy, Daddy, stop that, Daddy" then Boles heard more banging. *Id*. He described the banging as someone being thrown around the room. He said he called the police and told them it sounded like someone is being killed downstairs. N.T. 5/3/94 at 7. Petitioner's counsel did not question Boles.

Both Petitioner and O'Donnell filed petitions under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq*. Each Defendant was subsequently granted a new penalty phase trial by jury because neither Petitioner nor O'Donnell had knowingly waived their rights to a jury at their original penalty hearings. *Commonwealth v. O'Donnell*, 740 A.2d 198 (Pa. 1999); *Commonwealth v. Gribble*, CP-51-CR-1220811-1992 at 1-4 (Phila. Com. Pl. Dec. 3, 2001).

At these penalty retrials, the Commonwealth, as in all death penalty cases in Pennsylvania, was required to establish to the jury that the aggravating factors outweighed the mitigating factors. The judge explained to both juries that the sole aggravating factor advanced by the prosecution at each penalty rehearing was whether the murder was committed in furtherance of a felony, in this case, robbery of the victim.

At O'Donnell's penalty retrial, Boles' testimony from the post-trial hearing was read into the record. N.T. 2/1/02 at 55-61. Dr. Lieberman was cross-examined and admitted that there was a scenario in which one person could

have acted alone to dismember the victim's body. N.T. 1/31/02 at 69-75. Dr. Lieberman also acknowledged that he was new to his position of assistant medical examiner at the time he gave his testimony at the initial trial of Petitioner and O'Donnell and that at that time he had no special training in, nor had he consulted materials about, dismemberment. N.T. 1/31/02 at 80-81. Defense counsel also presented the testimony of Dr. Charles Wetli, an expert forensic pathologist. Dr. Wetli testified that the victim died from the hammer blows and disagreed with Dr. Lieberman's conclusion at trial that the presence of red abrasion marks on the victim suggested that the victim's heart continued to beat while the victim's neck and right arm were being dismembered. N.T. 2/1/2002 at 21. Dr. Wetli also testified that it was possible that one person had completed the murder and dismemberment alone. N.T. 2/1/2002 at 26-27. The jury unanimously found that no aggravating factors were present (a planned robbery) and, as a result, O'Donnell was resentenced to a term of life imprisonment.

Regarding Petitioner, defense counsel cross-examined Dr. Lieberman who again admitted that one person could have dismembered the body. N.T. 3/4/2009 at 86-87. Defense counsel also elicited testimony from Dr. Lieberman that, as was noted in his post-mortem report, the victim had head and right forearm injuries that could be consistent with being struck by a fist. N.T., 3/4/2009 at 81-84.  The jury could not reach a unanimous verdict on whether an aggravating factor (robbery existed) and Petitioner was resentenced to a term of life imprisonment. The Superior Court of Pennsylvania affirmed the trial court, and the Pennsylvania Supreme Court denied Petitioner's petition for allowance of

appeal. *Commonwealth v. Gribble*, No. CP-51-CR-1220811-1992 (Phila. Cnty. Com. Pl.), Criminal Docket at 21-22.

On May 13, 2009, Petitioner filed a *pro se* petition for a writ of habeas corpus in which he asserted 11 claims of ineffective assistance of trial counsel. (Hab. Pet. Br., ECF. No. 1-1, at 7-35). The Petition was assigned to the Honorable Mary A. McLaughlin. Judge McLaughlin referred the Petition to Magistrate Judge Sitarski for a R & R. Following the filing of a series of responses and replies to the Petition, the Magistrate Judge recommended on November 19, 2010, that all 11 ineffective assistance of counsel claims be dismissed as procedurally defaulted. (R & R, ECF No. 45). Petitioner filed Objections, but on September 12, 2011, Judge McLaughlin overruled the Objections and adopted the Magistrate Judge's R & R. (Objections, ECF No. 48; Order, ECF No. 49). On January 18, 2012, Petitioner's request for a certificate of appealability was denied by the United States Court of Appeals for the Third Circuit. (Not. of Appeal, ECF No. 50; Order, ECF No. 54).

In 2012, the United States Supreme Court held in *Martinez v. Ryan*, 566 U.S. 1 (2012) that inadequate assistance by post-conviction counsel may establish "cause" for a procedural default on federal habeas review if the post-conviction counsel failed to raise claims of trial counsel's alleged ineffectiveness that have "some merit." *Id*. at 14.

Following *Martinez*, Petitioner filed a motion under Rule 60(b)(6) of the Federal Rules of Civil Procedure, requesting Judge McLaughlin to consider whether the Supreme Court's holding in *Martinez* permitted review of some or all

of his 11 claims for ineffective assistance of counsel which Judge McLaughlin held were procedurally defaulted. (ECF 58). Judge McLaughlin referred the Rule 60(b)(6) motion to Magistrate Judge Sitarski for a R & R. (ECF 59).

On September 10, 2015, this matter was reassigned to the calendar of the undersigned, following the retirement of Judge McLaughlin. (ECF 93). In a R & R dated October 2, 2015, Magistrate Judge Sitarski recommended that Petitioner's Rule 60(b)(6) motion be denied because the underlying claims of trial counsel's ineffectiveness lacked merit. (ECF 96). Petitioner filed Objections to the R & R which were overruled by this Court on July 10, 2018. (Order, ECF No. 105; R&R, ECF No. 106; Objections, ECF No. 108; Order, ECF No. 109).

On July 27, 2018, Petitioner filed an appeal to the Court of Appeals for the Third Circuit. (ECF 110). On February 7, 2019, the Court of Appeals granted a Certificate of Appealability as to whether this Court erred in concluding that Petitioner could not show cause under *Martinez* to excuse the procedural default on the following single claim: "Whether trial counsel was ineffective for failing to present a viable defense due to the cumulative effect of the errors set forth in [Petitioner's] Petition." See *Gribble v. Superintendent Greene SCI*, No. 18-2707, Certificate of Appealability filed March 22, 2019.[2] According to Petitioner, these errors were limited to whether trial "[c]ounsel failed to rebut the testimony of the medical examiner [Dr. Lieberman]" or "to investigate and introduce evidence that would have established a timeline for the killing, including a 911 call and

---

[2] The Court of Appeals also granted a Motion to Supplement the Record with testimony from O'Donnell's 2002 penalty retrial, including the testimony of Dr. Wetli, the cross-examination of Dr. Lieberman and the post-verdict testimony of Boles. *Gribble v. Superintendent Greene SCI*, No. 18-2707, at Doc. 95.

testimony from an upstairs neighbor of McGlinchey, Joe Boles." (Br. for Appellant, App. ECF No. 74-1, at 44-58).

On September 30, 2021, the Court of Appeals subsequently vacated this Court's Order, in part, and remanded the case to this Court with instructions "to conduct an evidentiary hearing to consider whether trial counsel's failure to elicit testimony from the medical examiner [Dr. Lieberman] and neighbor [Joe Boles] rendered [Petitioner's] trial counsel ineffective." *Gribble v. Superintendent Greene SCI*, No. 18-2707, 2021 WL 4472866 at *3 (3d Cir. 2021).[3] The Court of Appeals affirmed the dismissal of all of Petitioner's remaining habeas claims. Upon remand, this Court referred the matter back to Magistrate Sitarski for the purpose of conducting the evidentiary hearing. (ECF 119).

On February 11, 2022, the Petitioner's counsel and the Commonwealth filed a "Joint Motion for Conditional Grant of Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254." (ECF 128). In the motion, the parties requested that the Court grant the writ of habeas corpus, "conditioned on [Petitioner] pleading *nolo contendere* to third-degree murder, conspiracy, robbery, and all of the other charges of which he was found guilty at state docket number CP-51-CR-1220811-1992, in exchange for a negotiated sentence of 20-40 years of incarceration with the Commonwealth's agreement to take no position on parole on the grounds that granting parole would not be wholly inappropriate and to not object to [Petitioner's] request to leave Pennsylvania while on parole to be with his family in Washington State." (ECF 128 at p. 2). The parties further requested

---

[3] By doing so, the Court of Appeals excused the procedural default for these claims.

that the Court stay execution of the writ for 180 days to allow for the parties to complete the *nolo contendere* plea. *Id.* The Joint Motion did not contain any argument as to the merits of Petitioner's remaining habeas claims.

In response, Magistrate Judge Sitarski directed the Commonwealth to file a brief explaining how Petitioner's custody violates the Constitution or laws of the United States and "specifically addressing whether trial counsel's failure to elicit testimony from the medical examiner and potential witness Joe Boles constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984)." (Order, ECF No. 129).

On April 1, 2022, the Commonwealth filed an "Explanatory Response" asserting that trial counsel performed deficiently by failing: (1) to effectively cross-examine the assistant medical examiner Dr. Lieberman or call an expert to question his conclusions; and (2) to call McGlinchey's upstairs neighbor, Joe Boles, as a witness. (Resp. to Order, ECF No. 132, at 11-15). The Commonwealth further contended that Petitioner had suffered prejudice from these alleged deficiencies and that the Commonwealth's "prior position opposing habeas relief rested on erroneous grounds." (Id. at 15-21). The Response also stated resolution of the case was in the Commonwealth's interest because a resolution "would avoid months or even years of further legal proceedings, allowing the Commonwealth to expend its limited resources on other important matters." *Id.* The Commonwealth also argued that a resolution "removes the risk to the Commonwealth associated with a retrial. [Petitioner] has agreed to plead nolo contendere to third-degree murder; because of the passage of time and/or

the evidence described here, a retrial jury could return either a not-guilty verdict

or a voluntary-manslaughter verdict. And the proposed resolution not only

ensures [Petitioner's] conviction of murder, it also ensures his continued

supervision after release, which the Commonwealth has concluded is appropriate

here." *Id*.

        The Magistrate Judge scheduled the evidentiary hearing for June 1, 2022.

However, after the parties informed the Magistrate Judge that Plaintiff's trial

counsel, Dr. Wetli and Boles had all passed away, the Magistrate Judge agreed

with the parties that there was no need for an evidentiary hearing and the matter

could be resolved on the existing record.

        On April 23, 2023, Magistrate Judge Sitarski issued a R & R,

recommending that this Court deny the Petitioner's habeas petition on the merits

concerning the claims of ineffective assistance of counsel remanded by the Court

of Appeals. (ECF 144). Both the Commonwealth and Petitioner subsequently

filed Objections with this Court. (ECF 149, 155). By Order dated August 17,

2023, the Court denied the parties' Joint Motion for Conditional Grant of Writ of

Habeas Corpus, pending review of the parties' Objections to the R & R. (ECF

156).

## STANDARD OF REVIEW

        "If a party timely objects to a magistrate

judge's report and recommendation, the district court must 'make a de novo

determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Equal Emp't Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017) (quoting 28 U.S.C. § 636(b)(1)). Regardless of whether timely objections are made, district courts may accept, reject, or modify—in whole or in part—the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Local Rule 72.31.

In addition, since neither of Petitioner's ineffective assistance of counsel claims were ever adjudicated on the merits in state court, this Court must review the claims *de novo*. *Thomas v. Horn*, 570 F. 3d 105, 124 (3d Cir. 2009).

## **DISCUSSION**

The Commonwealth's main Objection to the R & R was that the Magistrate Judge did not give proper deference to the Commonwealth's concession of habeas relief. The Court does not agree.

The Court notes that the Magistrate Judge specifically acknowledged the Commonwealth's concession of relief. (ECF 144 at 10-11). However, the Magistrate Judge correctly concluded that despite the Commonwealth's concession, she still had an obligation to make an independent determination as to whether a constitutional violation occurred. *Id.* at 11*; See Wharton v. Vaughn*, 371 F. Supp. 3d 195, 199 (E.D. Pa. Mar. 4, 2019) ("[U]nder § 2254, a district court's authority to grant the writ is limited to those cases in which there has been a violation of the Constitution or laws of the United States. It logically follows that a district court cannot dispense with this limitation merely because the prosecutor has now changed its position and conceded that there has been such a

violation." ) *see also Johnson v. McCaughtry*, 265 F.3d 559, 564 (7th Cir. 2001); *Every v. Blackburn*, 781 F.2d 1138, 1140–41 (5th Cir. 1986); *Saldano v. Cockrell*, 267 F. Supp. 2d 635, 642 (E.D. Tex. 2003) (noting that the court was "required to perform an independent analysis of [the petitioner's] claim," notwithstanding the government's agreement to relief); *Keyes v. Renico*, No. 05-cv-71160, 2005 WL 2173212, at *3 (E.D. Mich. Sept. 2, 2005) (same). Therefore, the Court will overrule the Commonwealth's Objection to the R & R.

Petitioner's Objections concern the merits of his claims of ineffective assistance of trial counsel under *Strickland*. In *Strickland*, the United States Supreme Court set forth the standard for a claim of ineffective assistance of counsel in violation of the Sixth Amendment. Counsel is presumed to have acted effectively unless the petitioner demonstrates both that "counsel's representation fell below an objective standard of reasonableness" and that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 686–88, 693–94.

First, the petitioner must demonstrate that his trial counsel's performance fell below an "objective standard of reasonableness." *Id*. at 688. The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. Because of the difficulties in making a fair assessment, eliminating the "distorting effect" of hindsight, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)).

To satisfy the second prong of the *Strickland* analysis, a petitioner must establish that the deficient performance prejudiced the defense. This showing requires a demonstration that counsel's errors were so serious as to deprive the petitioner of a fair trial or a trial whose result is reliable. *Strickland*, 466 U.S. at 687. More specifically, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. *See also Workman v. Superintendent Albion SCI*, 915 F. 3d 928, 944 (3d Cir. 2019).[4] This standard is "not stringent" and is "less demanding than the preponderance standard." *Branch v. Sweeney*, 758 F.3d 226, 238 (3d Cir. 2014).

### **Failure to question Dr. Lieberman about his post-mortem report**

The Court of Appeals concluded that "[g]iven the medical examiner's acknowledged inexperience, we see no reasonable trial strategy in failing to question his [post-mortem] report." *Gribble v. Superintendent Greene SCI*, No. 18-2707, 2021 WL 4472866 at *3 (3d Cir. 2021). As a result, the Court of Appeals found that "post-conviction counsel failed to raise a claim of ineffectiveness" and excused the procedural default on this claim. *Id*.

---

[4] Ironically, in *Workman, supra,* our Court of Appeals found the Petitioner's trial counsel was constitutionally ineffective for failing to appropriately cross-examine the same Dr. Lieberman involved in the case *sub judice*.

The Magistrate Judge essentially acknowledged that Petitioner's trial counsel was deficient for not specifically questioning Dr. Lieberman about the information in his post-mortem report[5] describing fist-marks on the victim's face but concluded that Petitioner could not satisfy the prejudice prong of *Strickland* because he "has not shown that additionally questioning Dr. Lieberman about the post-mortem report would have swayed the jury[6], particularly in light of the evidence against him." (ECF 144 at 21).

According to the R & R, this evidence included evidence that "O'Donnell knew that the victim would likely be carrying a substantial amount of cash because the two had engaged in numerous monetary transactions, including earlier on the night of the murder; that O'Donnell invited the victim to McClinchey's apartment at a time when she and Petitioner were aware that McClinchey would be absent; that on the night of the murder the hammer used to murder the victim was readily available setting on top of the living room television, not stored in the basement in a tool box as it usually was; and that Petitioner and O'Donnell used the victim's credit card to make purchases hours after the murder. (N.T. 6/16/1993 at 51; N.T. 6/29/1993, at 307, 405-10, 418-19)." *Id*.

"The effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial." *United States v. Gray*, 878 F.2d 702,

---

[5] There is no dispute that trial counsel had Dr. Lieberman's post-mortem report in his discovery packet.

[6] As noted, *supra* at 4, Petitioner's initial trial was not a jury trial, but was a bench trial.

711 (3d Cir. 1989). Petitioner gave a sworn statement to police in which he insisted that he committed the murder in the heat of passion after arriving at the apartment and seeing O'Donnell and the victim in a compromising position.

The prosecutor was never forced to explain the fist-marks on the victim's face or the parry fracture of the victim's wrist. At the penalty retrials of both Petitioner and O'Donnell, Dr. Lieberman was cross-examined about the fist-marks and the parry fracture. Specifically, Dr. Lieberman testified at Petitioner's penalty retrial that there were four injuries to the victim's face "consistent with a fist" and "consistent with a face-to-face confrontation with somebody having a fistfight." N.T. 3/4/2009 at 83. Furthermore, Dr. Lieberman testified the victim had a right forearm fracture which could have been a "parry injury" that occurred while he was blocking a blow "because [he saw] something coming." N.T., 3/4/2009 at 81-84.  Petitioner's penalty retrial jury could not reach a decision as to whether Petitioner planned to commit robbery.

If Petitioner's trial counsel had properly introduced the fist-mark evidence, he would have bolstered the sworn statement that Petitioner gave to the police that he committed the murder in the heat of passion.[7] This evidence would have

---

[7] In addition, Petitioner swore in his statement that he cut off the victim's penis for "spite." This statement was corroborated by the fact that when the victim's torso was found, it was missing the penis.  The act of cutting off the victim's penis is more indicative of an actor engaged in a jealous rage than it is of an actor carrying out a carefully planned robbery. The Court also notes that Petitioner stated in his sworn statement that the apartment was not empty on the night of the murder and that McGlinchey's friend, James "Pops" Mathews, was asleep in a back room of the apartment. N.T. 6/29/93 at 314. McGlinchey also testified that she believed "Pops" would have been at the apartment because when she arrived at the apartment the day after the killing, "they all" went to get "Pops fitted for a suit." N.T. 6/29/93 at 435-436. It does not make sense for Petitioner and O'Donnell to have planned a premeditated murder/robbery knowing that a third person would be in the apartment on the night of the murder. The fist-mark evidence, had it been introduced, would have further bolstered the Petitioner's sworn statement.

undermined the prosecutor's argument at trial that the victim was the subject of a sneak attack and raised serious doubt as to whether Petitioner was guilty of first-degree premeditated murder instead of third-degree murder or voluntary manslaughter.[8]

Indeed, during his closing argument at Petitioner's penalty retrial in 2009, penalty counsel specifically argued to the jury that "Billy Gribble told the police that there had been a fistfight first. Commonwealth says uh-uh, uh-uh, caught him unaware, hit him in the head with the hammer. That's ambush. If it started as a fistfight, if there is evidence of that in the case, then you can conclude that [Petitioner's] description was accurate." N.T. 3/6/2009 at 45. And the result was in fact different at Petitioner's penalty retrial in that the jury could not reach a unanimous decision on the robbery aggravator.

### Failure to impeach Dr. Lieberman regarding his testimony on dismemberment

The Court finds that Petitioner has satisfied the first prong of the *Strickland* analysis with respect to the testimony of Dr. Lieberman. Petitioner's trial counsel failed to cross-examine Dr. Lieberman and failed to consult with any experts to rebut Dr. Lieberman's testimony. Indeed, trial counsel did not call any witnesses, and presented no other evidence on behalf of this client. The Court finds that

---

[8] Voluntary manslaughter is a killing committed without lawful justification while under a sudden and intense passion resulting from serious provocation by the individual killed.  18 Pa.C.S. § 2503(a)(1).
Murder of the third degree encompasses all other kinds of murder that do not constitute first or second-degree murder. 18 Pa. C.S. § 2502(c). the Pennsylvania Superior Court has specified that third-degree murder is "an unlawful killing with malice but without specific intent to kill." *Commonwealth v. Dunphy,* 20 A.3d 1215, 1219 (Pa.Super.Ct.2011).

there was no sound strategy behind trial counsel's decisions and, therefore, that

trial counsel's performance falls below an objective standard of reasonableness.

  The Magistrate Judge concluded, however, that even if Dr. Lieberman had

been thoroughly cross-examined there is not a reasonable probability that the

outcome would have been different. According to the Magistrate Judge,

> [b]ut even if the factfinder accepted as true expert testimony that the victim's heart may not have been beating at the time of the dismemberment, and therefore that the dismemberment may have occurred more than fifteen minutes after the murder, this alleged fact fails to show that the murder was not premeditated. There are any number of reasons why Petitioner and/or O'Donnell may have waited more than fifteen minutes after committing the murder to dismember the body, including shock at what they had done, an inability to decide how to proceed, or hesitation to actually begin the gruesome process of dismembering and disposing of a human body. Furthermore, even though Dr. Wetli testified that it was possible for one person alone to have carried out the dismemberment, he could not say whether one person or two people in fact carried it out, thus leaving open the possibility of O'Donnell's participation. (N.T. 2/1/2002 at 27). In any event, whether the dismemberment was carried out by Petitioner alone or by both he and O'Donnell does not illuminate the question of whether the murder was premeditated. For example, notwithstanding a premeditated plan by Petitioner and O'Donnell to kill and rob Eleftheriou, Petitioner may have dismembered his body alone because he was more physically capable, especially in light of a deformity affecting O'Donnell's hands, or because O'Donnell simply backed out of the gruesome task. (N.T. 6/30/1993 at 513-15). Thus, Petitioner's claim is also speculative and should be rejected on that basis as well.

(R & R, ECF 144 at 20).

The evidence that was cited by the Magistrate Judge as supporting a first-degree murder conviction mainly included a chain of circumstantial evidence. (R & R, ECF 144 at 21). There was no eyewitness testimony. The only **physical** evidence suggesting the murder may have been premeditated was the dismemberment evidence and Dr. Lieberman's testimony about it at the trial in 1993. The prosecutor's argument that Petitioner and O'Donnell committed a premeditated murder was based, in part, on Dr. Lieberman's opinions that the dismemberment occurred immediately after the murder and required more than one person to accomplish. In any event, the dismemberment would have been after the fact and really had no bearing on whether the act itself was intentional. Yet, the trial judge cited Dr. Lieberman's conclusions in denying the post-trial motions of Petitioner and O'Donnell. ("[T]he medical examiner testified that since some of the dismemberment occurred when the victim's heart was still beating, it would have required more than one person." Court of Common Pleas Op. Pursuant to Rule 1925 June 8, 1995, at 3-4 (ECF 155-1). On direct appeal, the Pennsylvania Supreme Court specifically referenced Dr. Lieberman's testimony in affirming that Petitioner was guilty of first-degree murder. *Commonwealth v. Gribble*, 703 A.2d 426, 432 (Pa.1997).  ("[T]he assistant medical examiner testified that it would have taken two people to dismember Eleftheriou's body in the estimated fifteen minutes before he bled to death"). The Supreme Court of Pennsylvania also cited Dr. Lieberman's findings on dismemberment. *Commonwealth v. Gribble*, 863 A.2d 455, 459 (Pa. 2004) ("The expert further testified that red abrasions in the areas where the head and right arm were

severed indicated that the victim's heart was still beating when those body parts were severed. The expert concluded that, because the victim was a muscular man, one person acting alone could not have removed both the head and arm in fifteen minutes which was the amount of time it would have taken for the victim to bleed to death."). Therefore, it cannot be underestimated as to the role Dr. Lieberman's original testimony concerning dismemberment influenced the prosecutor, the trial judge, and the appellate courts in concluding that the murder was premediated as part of a robbery.

Indeed, the results of the two penalty retrials of Petitioner and O'Donnell during which Dr. Lieberman was thoroughly cross-examined about the dismemberment evidence and his post-mortem report was introduced, reveal that this additional questioning of Dr. Lieberman actually resulted in a different outcome, i.e., neither jury finding that Petitioner and O'Donnell intended to rob the victim. For instance, at O'Donnell's 2002 penalty retrial, Dr. Lieberman admitted that there was one scenario in which it was possible for one person to have dismembered the body. N.T. 1/31/2002 at 69-75. Dr. Lieberman also acknowledged he had been an assistant medical examiner for only two and one-half years at the time of the trial of Petitioner and O'Donnell and that he had no special expertise in, or a great wealth of experience with, dismemberment. See N.T. 1/31/2002 at 80-82.[9] Dr. Lieberman further admitted that he had not consulted learned treatises nor anyone with greater expertise on dismemberment

---

[9] Dr. Wetli was called to directly rebut Dr. Lieberman.

before giving his opinion that it was impossible for one person to have cut up the body.[10] *Id.*

At Petitioner's penalty retrial in 2009, Dr. Lieberman again admitted on cross-examination that there was a scenario in which one person could have dismembered the body. N.T. 3/4/2009 at 86-87. In other words, the dismemberment did not have to proceed immediately after the hammer blows and did not have to be undertaken by two individuals. Such testimony would clearly have undermined the prosecutor's theory that the murder was premeditated.

The R & R points out that Petitioner's trial counsel "did challenge [Dr. Lieberman's] credibility by eliciting an admission that his testimony concerning cause of death differed at the preliminary hearing and during direct examination. (N.T. 6/29/1993 at 368–71)." (ECF 144 at p. 21). However, this Court finds that this admission pales in comparison to the admission Dr. Lieberman made in his testimony at the penalty retrials concerning his inexperience with dismemberment in 1993, that one person could have performed the dismemberment and the information in his post-mortem report that the victim suffered facial and wrist injuries consistent with being struck by a fist. As clearly demonstrated by the results of the penalty retrials, there is a reasonable probability that, had that testimony been elicited, Petitioner would have been convicted of third-degree murder or voluntary manslaughter instead of first-degree murder.

---

[10] Dr. Lieberman did not state in his post-mortem report that two people dismembered the victim's body. N.T. 1/31/2002 at 83.

**Failure to call Joseph Boles as a witness[11]**

The Court of Appeals concluded that "[s]eeing no strategy to ignore this witness or his emergency call, reasonable jurists could debate the merits of trial counsel's effectiveness." *Gribble v. Superintendent Greene SCI*, No. 18-2707, 2021 WL 4472866 at *3 (3d Cir. 2021). As a result, the Court of Appeals found post-conviction counsel's performance to be deficient. *Id*.

In her R & R, the Magistrate Judge found that although trial counsel may have been deficient for not calling Boles as a witness, Petitioner had not satisfied the prejudice prong of *Strickland* with respect to the Boles testimony. Specifically, the Magistrate Judge rejected as "speculative" the parties' joint argument that Boles' testimony that he heard shouting and a woman yelling "Daddy, Daddy, stop that, Daddy" during the murder would have undercut the prosecutor's theory of premeditation because it is unlikely that a planned ambush would involve one of the conspirators yelling loudly enough for the neighbors to hear." (ECF 144 at 14). According to the Magistrate Judge, "[i]t is at least equally possible that, even during a pre-planned attack, a person witnessing a violent murder—here, the victim was repeatedly struck in the head with a hammer ten or fifteen times— might begin shouting unexpectedly, notwithstanding the prior plan to kill the individual." *Id*. at 14-15.

The Boles testimony, if it had been presented[12], would have lent credence to Petitioner's statement that he killed the victim in a jealous rage that even

---

[11] Given that Boles testified at the post-verdict hearing in 1994, there can be little doubt that he would have been available and willing to testify at the Petitioner's trial one year earlier in 1993.
[12] There is no dispute that trial counsel had Mr. Boles' police interview in his discovery packet.

shocked O'Donnell to the extent that she repeatedly shouted for him to stop. At the very least, there is a reasonable probability that the testimony and 911 call combined with Petitioner's sworn statement could have raised doubt as to the viability of the prosecutor's theory that the murder was premeditated and not committed in the heat of passion.[13]

During O'Donnell's penalty retrial, the jury did hear Boles' testimony [and an effective cross-examination of Dr. Lieberman and the opinion of Dr. Charles Wetli, an expert forensic pathologist.] And that jury unanimously found that there was no aggravating factor of a killing in furtherance of a robbery. At Petitioner's penalty retrial, the jury only heard the thorough cross-examination of Dr. Lieberman. Yet, even this testimony was enough to create an impasse for the jury on the robbery aggravator.

The Magistrate Judge again cited the previous evidence discussed, *supra* at 16, as support for her belief Boles' testimony "would not have rebutted any of the prosecution's evidence of premeditation." (R & R, ECF 144 at 15-16). Perhaps. However, this Court finds that the cumulative effect of Boles' testimony combined with an effective cross-examination of Dr. Lieberman as to his testimony on dismemberment and his post-mortem report combined with the evidence that the victim's penis had been cut off, and the apartment was not empty on the night of the murder would have created enough serious doubt as to whether the murder was premeditated. That would have created a reasonable

---

[13] Boles' testimony would also discredit O'Donnell's inculpatory statements (and bolstered Petitioner's) because if O'Donnell's statement of committing the murder alone were true she certainly wouldn't have been yelling "stop daddy."

probability that the trial judge could have found Petitioner guilty of third-degree murder or voluntary manslaughter.

For these reasons, the Court will sustain the Petitioner's Objections to the R & R of the Magistrate Judge and not adopt the majority of the R & R. The parties may renew their Joint Motion for Conditional Grant of Writ of Habeas Corpus.

An appropriate Order follows.